Jeanette MARINICH, Plaintiff–Appellant,

v.

THE PEOPLES GAS LIGHT AND COKE COMPANY, Defendant–Appellee.

No. 01–4013.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 7, 2002.

Decided Sept. 10, 2002.

Before BAUER, KANNE, and WILLIAMS, Circuit Judges.

## ORDER

Jeanette Marinich filed this action against The Peoples Gas Light and Coke Company alleging employment discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. The district court granted Peoples Gas's motion for summary judgment. Marinich appeals, and we affirm.

Marinich, who is white, began working at Peoples Gas as a Data Key Punch Operator in 1968. Over the next thirty years she was promoted to a series of administrative and managerial positions in public relations and advertising. When she was fired in 1997 at age forty-seven, Marinich was the Administrator of Consumer Information, an "executive management" position, and supervised two other employees. Her duties involved the management of Peoples Gas's market research, customer satisfaction, and advertising efforts. She reported to Gene Waas, Manager of Marketing Services, and Thomas O'Sullivan, Vice President of Marketing and Business Development.

In March 1997 Desiree Rogers, an African American woman, was hired as Vice President of Corporate Communications for Peoples Energy Corporation, the parent company of Peoples Gas. Rogers and Marinich both attended the American Gas Association conference in New Orleans, Louisiana, on May 5, 1997. During a roundtable discussion Marinich told other conference participants that she was in charge of advertising for Peoples Gas, including the company's new brand advertising initiative. After the roundtable Rogers approached Marinich and demanded that she cease all brand advertising work because Rogers herself was going to supervise that project. Marinich told Rogers that she would need to verify that directive with O'Sullivan. O'Sullivan had previously told Marinich that she would be in charge of brand advertising. Growing agitated, Rogers shook her finger in Marinich's face, saying that the brand advertising project required "young blood with fresh ideas." Marinich repeated that she would contact O'Sullivan before complying with Rogers's orders, and Rogers walked away, telling Marinich that she needed to lose her "privileged WASP attitude."

Marinich phoned O'Sullivan from New Orleans to report her confrontation with Rogers. During this conversation, Marinich asked O'Sullivan if Rogers was going to be in charge of brand advertising for Peoples Gas and declared that, in the event advertising became part of Corporate Communications, she would be unable to work for Rogers. O'Sullivan told Marinich that he did not know whether Rogers would be taking over responsibility for brand advertising.

When she returned from New Orleans, Marinich again asked O'Sullivan about the future of the brand advertising project, and he repeated that he lacked information. On June 4 Marinich still had not received an answer concerning Rogers's involvement with brand advertising, and so for the third time she called O'Sullivan. Finally, on June 12 O'Sullivan informed Marinich that the Consumer Information Group at Peoples Gas was being transferred to Rogers's department, the Corporate Communications Division of Peoples Energy. Marinich reiterated her unwillingness to work under Rogers and requested a transfer. She then met with Barbara Benchik, Manager of the Affir-

mative Action and Employment Policies Division, and pressed her demand for a transfer. Marinich told Benchik about her encounter with Rogers in New Orleans and about complaints she had heard from other employees concerning Rogers.

Benchik in turn notified John Ibach, Vice President of Human Resources, and both Benchik and Ibach conferred with Rogers. Rogers told Ibach that she felt that the company's brand advertising plans "shouldn't necessarily be made public" and that she told Marinich that the project "was not appropriate to be discussed" at the New Orleans conference. She denied having made the age- and race-based comments that Marinich attributed to her. Based on their conversations with Rogers, both Benchik and Ibach concluded that Rogers never made the alleged comments and that, even if she did, they were not discriminatory.

At a meeting with Benchik and Executive Vice President Thomas Patrick on June 24, Marinich again requested a transfer and suggested that Peoples Energy design a position for her as a liaison between the Peoples Gas Marketing Division and the Peoples Energy Corporate Communications Division. Marinich further proposed, if a transfer was not possible, that she take a leave of absence for approximately two years until she was eligible for full retirement benefits.

The morning after Marinich's meeting with Benchik and Patrick, Marinich and Rogers rode to their offices on the same elevator. Marinich claims that Rogers, instead of stopping to present her identification badge at the security checkpoint, "chased" her into the elevator and said "good morning" in a sarcastic tone. According to Marinich, Rogers stood "in her face" and stared at her for the entire elevator ride.

Marinich informed Benchik and Patrick of this elevator incident on June 30. At the same meeting Patrick informed Marinich that a transfer was not possible because there were no open positions that she was qualified for, and the company had no plans to create the suggested liaison position. Patrick also denied Marinich's request for a leave of absence. Patrick told Marinich that her refusal to accept Rogers's authority would be considered insubordination.

Rogers's Corporate Communications Division was to take control of the Consumer Information Group on July 1, the following day. Benchik prepared a letter notifying Marinich that she would be terminated if she failed to report to work. Marinich packed her personal belongings before she left her office on June 30 and did not come to work the next morning. Marinich called Benchik and asked whether she had been fired. Benchik told her that she would still have a job if she came to work that afternoon. But Marinich declined to do so, and Peoples Gas terminated her.

Marinich subsequently filed a complaint in district court, alleging that Peoples Gas had discriminated against her because she was white and over forty years of age. Marinich claimed that Rogers subjected her to discriminatory age- and race-based comments and treated African American employees under forty more favorably than she treated white and Hispanic workers. She did not report to work "because of the intimidation, humiliation, discrimination and harassment which she knew she would suffer" under Rogers's supervision. Marinich further charged that, in circumstances comparable to her own, Peoples Gas had allowed similarly situated male employees to transfer to other departments; thus, Peoples Gas had also discriminated against her on the basis of her sex. Moreover, Marinich alleged that Peo-

ples Gas had retaliated against her by not investigating her complaint about Rogers and, finally, by terminating her.

We review a grant of summary judgment *de novo. Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 731 (7th Cir.2001). Granting a defendant's motion for summary judgment is appropriate only when, viewing all the facts and evidence in the light most favorable to the plaintiff, we determine that there is no genuine issue of material fact. *Id.* A plaintiff in an employment discrimination case can survive summary judgment in two ways. Under the direct method of proof, the plaintiff uses either direct or circumstantial evidence to demonstrate that an employer engaged in discrimination. *Sattar v. Motorola,* 138 F.3d 1164, 1168–69 (7th Cir.1998). Under the indirect method of proof, a plaintiff who presents sufficient evidence for a prima facie case establishes a presumption of discrimination. *Id.* at 1169.

■ Marinich first argues that the district court ignored direct evidence of discrimination—the age- and race-based comments that Rogers made in New Orleans. Direct evidence is evidence that amounts to an acknowledgment of discriminatory intent on the part of the employer. *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001); *Troupe v. The May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). Statements that reveal an impermissible bias can serve as direct evidence only if they are made by a decisionmaker, i.e., by someone who has the power to alter the plaintiff's employment status. *Larimer v. Dayton Hudson Corp.,* 137 F.3d 497, 500 n. 4 (7th Cir.1998). At the time Rogers made the comments in question, the Consumer Information Group had not yet been transferred to Rogers's Corporate Communications Division, and Marinich reported to Gene Maas and O'Sullivan, not to Rogers. Rogers did not have the power to significantly alter the conditions of Marinich's employment at the time of the New Orleans conference or, indeed, at any time thereafter. The record reveals that Benchik, Ibach, and Patrick, and not Rogers, fired Marinich. Because Rogers was not involved in the decision to fire Marinich, her remarks cannot be evidence that this decision was discriminatory. *See Gorence,* 242 F.3d at 762.

Marinich counters, however, that Rogers became her supervisor, and thus a decisionmaker, on July 1, 1997, the day she was terminated. Marinich also contends that it was Rogers who removed her from the brand advertising project and that this decision was part of Rogers's "continuous attempt to get rid of [her]." Had she accepted the transfer to Corporate Communications, Marinich claims, Rogers would eventually have terminated her. As evidence that Rogers was scheming to force her out of the company, Marinich points to an organizational chart that Rogers generated prior to July 1. The chart lists a vacancy for the position of Manager of Advertising, and Marinich construes this as proof that Rogers intended to fire her shortly after the transfer became official. The decision to terminate her employment was Rogers's, Marinich contends, and Ibach was merely "the messenger."

None of Marinich's attempts to establish Rogers as a decisionmaker succeeds. That Rogers became Marinich's supervisor on July 1 is irrelevant; by July 1 Benchik, Ibach, and Patrick had already decided to fire Marinich if she refused to report to Rogers as ordered. The record does not definitively establish who decided to assign brand advertising to Rogers and fold the Consumer Information Group into Corporate Communications, or why these decisions were made. But in any event the record does not demonstrate, and Marinich

does not allege, that Rogers, as Vice President of Corporate Communications, had the authority to transfer employees or restructure departments and divisions within the company. And the blank space in Rogers's organizational chart is inconsequential because Marinich, as she herself testified, never held the title of Manager of Advertising. She was an Administrator whose immediate superior, Gene Waas, was a Manager. No one ever represented to Marinich that she would become Manager of Advertising once the Consumer Information Group became part of Corporate Communications.

▪ Marinich further argues that she offered circumstantial, as well as direct, evidence of discrimination. Circumstantial evidence is evidence that provides the basis for an inference of intentional discrimination. *Gorence,* 242 F.3d at 762. Marinich's circumstantial evidence consists of a series of anecdotes about employees in the Corporate Communications Division who had difficulty getting along with Rogers. Among these employees are an Hispanic administrative assistant who was demoted to the typing pool because Rogers was not satisfied with her work, an older Hispanic man who felt that he was the best candidate for a position that Rogers gave to an African American, and several white workers whom Rogers berated or reprimanded. But Rogers's treatment of her underlings is beside the point because Rogers was never Marinich's supervisor.

Marinich submits that, even if she cannot succeed under the direct method of proof, she established a prima facie case of age and race discrimination under the indirect method, using the burden-shifting test established by *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of employment discrimination, a plaintiff must meet the four prongs of the *McDonnell Douglas* test: 1) she must be a member of a protected class, 2) she must meet her employer's legitimate performance expectations; 3) she must suffer an adverse employment action; 4) and she must establish that similarly situated employees receive more favorable treatment. *O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 983 (7th Cir.2001). If the plaintiff's claim passes the *McDonnell Douglas* test, the defendant may offer as rebuttal a legitimate, nondiscriminatory reason for its action. *O'Regan,* 246 F.3d at 983. Once the defendant gives this reason, the plaintiff can overcome summary judgment only by presenting evidence sufficient to conclude that the reason is pretextual. *Id.*

▪ Because she is over forty, Marinich is a "member of a protected class" for the purposes of the ADEA., and so her age discrimination claim passes the first prong of the *Mc Donnell Douglas* test. Marinich's race discrimination claim does not, however. In a case of "reverse" racial discrimination, the plaintiff satisfies the first prong of the *Mc Donnell Douglas* test by demonstrating "background circumstances" that indicate an employer's inclination or motivation to discriminate or "a logical reason" to believe that an adverse employment decision is based on the fact that the plaintiff is white. *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 455, 457 (7th Cir.1999). These "background circumstances" are not present here. *See Mills,* 171 F.3d at 455–57. Marinich, based on accounts that she heard from employees in the Corporate Communications Division, alleges that Rogers mistreats whites and Hispanics who work under her supervision. But the subjective opinions of a handful of Peoples Gas employees are insufficient to establish that

Rogers singled out Marinich for mistreatment. *See Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 348 (7th Cir.1997).

Marinich also notes that Rogers hired four employees between March 1997 and January 1998, all of whom were African American. From this assertion Marinich leaps to the conclusion that Rogers discriminates against whites and Hispanics when hiring. But Marinich is speculating; she has presented no information about the racial composition of the applicant pools for the open positions in the Corporate Communications Division or of the Division as a whole. *See Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 650–51, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In fact, Marinich supports this contention with nothing other than her own statement that Rogers hired only African Americans, a charge that Peoples Gas denied. Marinich's subjective beliefs are insufficient to create a presumption of discrimination. *See Fairchild,* 147 F.3d 567, 574 (7th Cir. 1998).

■ Even if Marinich's collection of anecdotes could establish the necessary "background circumstances," her reverse racial discrimination claim, as well as her age discrimination claim, fail because she did not meet Peoples Gas's legitimate expectation that she show up for work. Marinich argues that Peoples Gas used her absence on July 1 as a pretext for terminating her based on age and race. She seizes upon "inconsistencies" in the deposition testimony and affidavits of the three executives who fired her, arguing that an employer's reasons are pretextual if inconsistencies call the employer's entire testimony into question. *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1422 (7th Cir. 1992). Patrick averred that he authorized Benchik to fire Marinich; Benchik testified that she consulted with Ibach before terminating her; Ibach testified that he, Ben-chik, and Patrick felt that they, rather than Rogers, should deal with Marinich's insubordination. But these "inconsistencies" certainly are not significant enough to cast doubt upon the overall credibility of Benchik, Ibach, or Patrick. *Id.*

Further, it is debatable that Marinich suffered an adverse employment action in the first place. A lateral transfer is not an adverse employment action when it does not decrease an employee's benefits or basic responsibilities. *Stutler v. Ill. Dep't of Corrections,* 263 F.3d 698, 702–03. Marinich would have performed essentially the same job once the Consumer Information Group became part of the Corporate Communications Division. And although termination is an adverse employment action, Marinich consciously chose termination over accepting Rogers's authority. Marinich's job was secure as long as she reported to work on July 1. When she did not, Benchik offered Marinich a last chance to save her job by coming to work that afternoon, but she refused. Essentially, Marinich quit.

■ She had no choice but to quit, Marinich contends. She argues that the transfer of her position to the Corporate Communications Division amounted to a constructive discharge because she was "forced ... to resign in order to escape the intolerable environment created by Rogers." A constructive discharge claim succeeds only when unlawful discrimination made working conditions so intolerable as to compel a reasonable person to quit. *Tutman v. WBBM–TV, Inc.,* 209 F.3d 1044, 1050 (7th Cir.2000). The sharp verbal exchange between Marinich and Rogers at the New Orleans convention and Rogers's obnoxious behavior towards Marinich on the elevator do not meet the threshold required for a finding of constructive discharge. *See Tutman,* 209 F.3d 1044, 1050 (7th Cir.2000). These in-

cidents do not even qualify as the severe or pervasive harassment that characterizes an "ordinary" hostile work environment case. *Cerros v. Steel Technologies, Inc.,* 288 F.3d 1040, 1045–46 (7th Cir.2002); *Tutman,* 209 F.3d at 1050. Rogers's behavior may have been offensive, but "merely offensive" behavior does not make a workplace objectively hostile or abusive. *Cerros,* 288 F.3d at 1046. And even in an "ordinary" hostile environment case, a plaintiff is expected to remain at her job while pursuing legal remedies. *Tutman,* 209 F.3d at 1050.

Marinich's next argues that Peoples Gas afforded more favorable treatment to male workers who found themselves in circumstances similar to her own. In 1996 Peoples Gas transferred three male workers to Peoples Energy Services Corporation ("PESC"), a marketing company and newly-formed subsidiary of Peoples Energy. These transfers were voluntary, and the workers were promised they could return to Peoples Gas in the future if they so desired. All three workers eventually asked, and were allowed, to transfer back to Peoples Gas.

■ To establish that Peoples Gas treated these male workers more favorably, Marinich was required to demonstrate that she and these workers were similarly situated. *See Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002); *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617 (7th Cir.2000). An employee is similarly situated if he is "directly comparable to [the plaintiff] in all material respects." *Patterson,* 281 F.3d at 680. But the transferred male workers are not "directly comparable" to Marinich. Marinich's job would remain unchanged after Rogers became her supervisor; the three male workers, on the other hand, were transferred to PESC, a new and different company. Furthermore, the

three male workers returned to People's Gas because of a change in the compensation structure at PSEC, not because they were unhappy with their supervisor.

■ Finally, Marinich argues that Peoples Gas retaliated for her complaint against Rogers by refusing to investigate and, eventually, by terminating her. Marinich's retaliation claim fails. First, the record belies her assertion that Peoples Gas did not investigate her complaint about Rogers. Benchik, Ibach, and Patrick all met with Marinich to discuss her concerns, and both Benchik and Ibach spoke with Rogers. Further Marinich produced no evidence to establish a causal link between the filing of her complaint and the termination of her employment. *See Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). Marinich cannot escape the fact that Peoples Gas terminated her for insubordination.

AFFIRMED.