In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2366

Robert Tutman,

Plaintiff-Appellant,

v.

WBBM-TV, Inc./CBS, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 4424--Elaine E. Bucklo, Judge.

Argued November 30, 1999--Decided April 20,
2000

  Before Manion, Kanne and Rovner, Circuit
Judges.

  Kanne, Circuit Judge.  CBS producer Robert Vasilopulos testified that "it was simply a joke" when he told Robert Tutman, an African-American CBS cameraman, about a comedic movie called Niggers with Hats and parroted a phrase from the movie by telling Tutman to "[g]et the fuck out of the office before I pop a cap in your ass." Tutman, however, viewed the comment as a serious death threat and lodged a formal harassment complaint with their employer WBBM-TV, Inc./CBS, Inc. ("CBS"). When CBS responded by punishing Vasilopulos and promising to separate Vasilopulos from Tutman at work, Tutman remained dissatisfied and eventually sued CBS under Title VII of the Civil Rights Act, 42 U.S.C. sec.sec. 2000e to 2000e-17. The district court granted summary judgment for CBS on the hostile work environment and constructive discharge claims, and Tutman appealed. We affirm summary judgment because CBS took prompt and appropriate remedial action to prevent further harassment and Tutman cannot establish constructive discharge based on the incident with Vasilopulos.

I.  History

   During the afternoon of Friday May 19, 1995, Tutman was conversing with sportscaster Tim Weigel in the WBBM-TV sports office when CBS co-worker Vasilopulos strolled into the office and said twice to Tutman, "Get the fuck out of the office before I pop a cap in your ass." According to Tutman, Vasilopulos began prancing around, derisively caricaturing African-Americans. Surprised by Vasilopulos's outburst, Tutman responded that the correct phrase was "bust a cap," not "pop a cap."/1 Vasilopulos asked whether Tutman had seen a movie entitled Niggers with Hats. Tutman answered that movies like Niggers with Hats were profitable and that Vasilopulos should make a similar movie with Tutman's help. After two minutes, both men departed the sports office.

   However, Tutman later would testify that he interpreted Vasilopulos's outburst as a racially-motivated death threat and was quite shaken by Vasilopulos's histrionics. After leaving the sports office, he visited his supervisor Andrea Jenkins and told her about Vasilopulos's bizarre behavior. Jenkins assured him that he had done well to notify her and that she would investigate his complaint. Tutman also called D.E. Simmons, an outside consultant retained by CBS to advise on workplace concerns, and told him about Vasilopulos. Simmons then contacted Jenkins who asked Simmons to meet with her at the office forthwith. The pair discussed the situation, then immediately reported Tutman's complaint to News Director John Lansing. Lansing investigated further by speaking to Weigel and Vasilopulos that night about the incident.

   On Monday May 22, 1995, Tutman telephoned CBS that he would not come to the station for work because of the incident with Vasilopulos the previous Friday. CBS gave Tutman his work assignment over the telephone, but Tutman did venture to the station that afternoon to meet with General Manager Robert McGann about his complaint. Jenkins and Lansing then briefed McGann about the results of their investigation thus far.
   On Tuesday, McGann, Jenkins, Lansing, Simmons and Vasilopulos met to discuss

Vasilopulos's version of events. Afterward, McGann informed the CBS human resources department about Vasilopulos's conduct and Tutman's complaint. On Friday, one week after the incident between Vasilopulos and Tutman, CBS's Director of Policy and Administration Sandra Spangenberg arrived from CBS head quarters in New York to investigate firsthand. After interviewing Tutman, Vasilopulos and other witnesses, Spangenberg told Tutman that his allegation was serious and Vasilopulos's obnoxious behavior would not be tolerated at CBS. Spangenberg told both Vasilopulos and Tutman that Vasilopulos would be punished.

Based on Spangenberg's recommendations, CBS found that Vasilopulos posed no physical threat to Tutman but had been grossly inappropriate. CBS imposed a tripartite punishment on Vasilopulos: (1) a written warning placed in his personnel record making clear that future misconduct would lead to more serious discipline; (2) mandatory participation in a three-day interpersonal skills workshop aimed at promoting better workplace relationships; (3) Vasilopulos was required to apologize to Tutman. In addition, CBS re-circulated its anti-discrimination and fair employment policies to all employees. CBS previously had disciplined Vasilopulos with letters of reprimand for yelling "get the fuck out of my office" at producer Howard Dorsey and for using profanity in the presence of editor Debra Segal. However, at the time, Vasilopulos's personnel file contained no previous harassment complaints or disciplinary actions against him. Later, union official Jessica Logan would testify that Vasilopulos had disparaged CBS camera technician Morris Jones "as a nigger" in June 1995, a month after CBS's investigation of Vasilopulos's harassment of Tutman, but Jones did not bring a formal charge against Vasilopulos.

Predictably, Vasilopulos was unenthusiastic about his punishment. Vasilopulos balked at apologizing to Tutman but understood that CBS was taking Tutman's complaint "very seriously" and would terminate him if he did not comply. With continued insistence by CBS, Vasilopulos wrote a June 2, 1995, letter addressed to "whom it may concern,"

explaining noncommitally that he regretted "that comments exchanged in a joking manner with Robert Tutman, on May 19, 1995, were misinterpreted." Vasilopulos also complained about attending the interpersonal skills workshop taught by Simmons, and CBS allowed Vasilopulos instead to attend an alternative three-day sensitivity seminar from August 23 to August 25, 1995. Vasilopulos managed to leave the final day of the program a few hours early.

Despite CBS's response, Tutman refused to work because he felt "unsafe." CBS told Tutman that his assignments could be given by telephone and that he and Vasilopulos could be given staggered shifts to ensure that he would not encounter Vasilopulos at work. Nonetheless, CBS maintained that Tutman had to report for work, and when Tutman remained intransigent, CBS placed Tutman on a paid medical leave of absence. By his admission, Tutman was happy to collect salary without working and did not object. However, CBS's employment policy limited medical leave to six months, and this edict had been strictly enforced without exception during the previous ten years. As the expiration of Tutman's leave drew imminent, Tutman insisted on additional paid leave so that he could "get back in shape" but failed to provide a note from his doctor verifying that extended leave was medically necessary. Indeed, Tutman admits that he had not sustained a serious illness, and his doctors said that there was no reason Tutman could not return to work. As a result, CBS considered Tutman "voluntarily resigned" when his six-month medical leave lapsed on November 22, 1995.

Tutman filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission that day. On July 19, 1996, Tutman filed suit against CBS in district court alleging retaliation, racially hostile work environment and constructive discharge under Title VII of the Civil Rights Act. The district court referred the case to Magistrate Judge Morton Denlow who recommended that the district court grant summary judgment for CBS on all Tutman's claims. On April 29, 1999, the district court adopted the magistrate's recommendations and granted

summary judgment for CBS on all Tutman's claims. Tutman appeals summary judgment on his hostile work environment and constructive discharge claims.

II.  Analysis

We review de novo the district court's grant of summary judgment, drawing our own conclusions of law and fact from the record before us. See Haefling v. United Parcel Serv., 169 F.3d 494, 497 (7th Cir. 1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.  Hostile Work Environment

Tutman's central claim before the district court was that he suffered a racially hostile work environment, based on the Vasilopulos incident, in violation of Title VII of the Civil Rights Act. For workplace conduct to constitute a hostile work environment actionable under Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) (citation omitted). However, an employer is not strictly liable under Title VII for sexual harassment perpetrated by its employees. See Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 320 (7th Cir. 1992). In hostile work environment cases, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. See Saxton v. American Tel. & Telegraph Co., 10 F.3d 526, 535 (7th Cir. 1993). The district court found that Tutman had established a genuine issue of material fact whether the Vasilopulos incident created a hostile work environment, but

granted summary judgment for CBS because it found that CBS had taken prompt, effective remedial action in response to the incident. We do not decide whether a hostile work environment existed because the question whether CBS took prompt and effective remedial action is dispositive here.

CBS responded promptly to Tutman's harassment complaint. CBS began investigating Tutman's allegation on the day of the incident, and CBS's general manager interviewed both Tutman and Vasilopulos on the next work day. Within two weeks, CBS had completed its investigation and sanctioned Vasilopulos by issuing him a letter of reprimand, sending him to sensitivity training and commanding him to apologize to Tutman. When Tutman would not return to work, CBS offered to arrange his and Vasilopulos's work schedules so that they would have no contact with each other at work.

Tutman argues that CBS's response was insufficiently punitive given the severity of Vasilopulos's conduct on May 19, 1995. However, the question is not whether the punishment was proportionate to Vasilopulos's offense but whether CBS responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring. See Saxton, 10 F.3d at 535. By punishing Vasilopulos and promising to segregate Vasilopulos from Tutman at work, CBS made it distinctly improbable that Vasilopulos would further harass Tutman because the two men would have such limited contact, if any, with each other at work. In Saxton, the employer effectively responded to the plaintiff's report of sexual harassment by transferring the harasser to a different department because the transfer "served to terminate all contact between [the harasser] and [the plaintiff] and bring a definitive end to any harassment." Saxton, 10 F.3d at 536. Similarly, in Savino v. C.P. Hall Co., 199 F.3d 925, 933 (7th Cir. 1999), the employer's relocation of the harasser to a different floor than the plaintiff, in response to her harassment complaint, constituted effective remedial action likely to prevent recurrence of harassment. Likewise here, separating Vasilopulos and Tutman made it quite unlikely that Vasilopulos would harass Tutman again.

Of course, if separating Vasilopulos and Tutman at work would have disadvantaged Tutman, CBS's response would have been inadequate because remedial action that makes the victim worse off is ineffective per se. See Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990). However, Tutman has not established that he would have been injured by CBS's proposed response. CBS has several sports producers other than Vasilopulos, so Tutman would not have been precluded from working sports assignments. Tutman also introduced no evidence that rearranging his work schedule would have forced him to relinquish his union stewardship.

In addition to dissociating Vasilopulos from Tutman, CBS warned Vasilopulos sternly that CBS would not tolerate further harassment of co-workers. CBS reprimanded Vasilopulos, sent him to sensitivity training and ordered him to apologize to Tutman. Vasilopulos boorishly refused to attend the assigned sensitivity training seminar before acquiescing to a different program, from which he arranged to exit early. Vasilopulos also resisted apologizing to Tutman and ultimately penned an unconvincing, three-sentence missive only after continued insistence by CBS management. We sympathize with Tutman's frustration over Vasilopulos's recalcitrance, but Title VII does not require that CBS punish Vasilopulos commensurately to his conduct. The key here is that CBS responded promptly with remedial action reasonably calculated to end Vasilopulos's harassment of Tutman by making clear to Vasilopulos that further harassment would result in termination and credibly promising Tutman that he would have no contact with Vasilopulos at work.

Alternatively, Tutman offers the novel claim that CBS is liable under Title VII for its failure to prevent Vasilopulos from racially harassing him despite prior indications that made harassment foreseeable. Namely, Tutman points to other instances of verbal abuse by Vasilopulos--incidents of yelling at CBS employees Howard Dorsey, Debra Segal and Morris Jones. Without deciding the viability of a Title VII claim for failure to prevent foreseeable workplace harassment, we find that CBS could not be reasonably expected to have prevented

racial harassment here. Tutman alleges only a single racial harassment incident--Vasilopulos allegedly called Jones a "nigger"--of which CBS might have been aware, and that incident occurred in June 1995, after Vasilopulos's harassment of Tutman and Tutman's departure from CBS. Under these facts, CBS was not forewarned before May 19, 1995, that it should have done more to prevent Vasilopulos from engaging in racial harassment.

B.  Constructive Discharge

To establish a claim for constructive discharge under Title VII, a plaintiff must prove that his working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation. See Vitug v. Multistate Tax Comm'n, 88 F.3d 506, 517 (7th Cir. 1996). Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because "in the 'ordinary' case, an employee is expected to remain employed while seeking redress." See Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir. 1998).

Tutman refused to return to work after Vasilopulos harassed him, but a reasonable employee would not have found work conditions at CBS to be so intolerable that he would have to quit his job. In fact, Tutman did not claim at the time that he could not return to work after his medical leave expired. Instead, despite the absence of medical corroboration, Tutman requested extended leave to get back into shape. Aside from Tutman's bare assertions, there is little to suggest that Tutman's working conditions would have been so objectively intolerable based on the lone incident with Vasilopulos. In cases finding constructive discharge, the plaintiffs suffered from much more severe and sustained harassment. See, e.g., Snider v. Consolidation Coal Co., 973 F.2d 555, 558 (7th Cir. 1992); Taylor v. Western & S. Life Ins. Co., 966 F.2d 1188, 1191 (7th Cir. 1992); Sanchez v. Denver Pub. Sch., 164 F.3d 527, 534 (10th Cir. 1998). In Taylor, we found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head. Taylor,

966 F.2d at 1191. In Brooms v. Regal Tube Co., 881 F.2d 412, 417, 423 (7th Cir. 1989), the plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her. A credible death threat that signals grave danger to the plaintiff's bodily integrity, as in Taylor and Brooms, can constitute grounds for finding constructive discharge, but the harassment suffered by Tutman at Vasilopulos's hands falls well short of this standard.

A reasonable person would not have feared Vasilopulos as a result of his single oblique threat, even construing all reasonable inferences in favor of Tutman, such that he would feel forced to resign. See, e.g., Drake, 134 F.3d at 887; Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996); Saxton, 10 F.3d at 537. In Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 877-78 (7th Cir. 1999), a co-worker's comment that "someone should take a dish and knock [the plaintiff] upside the head" did not establish constructive discharge. Likewise, in Lindale v. Tokheim Corp., 145 F.3d 953, 956 (7th Cir. 1998), "boorish behavior" by co-workers was insufficient for constructive discharge. Vasilopulos's harassment of Tutman was closer to the abuse suffered in these cases than to the vicious harassment in Brooms or Taylor. Even assuming that Vasilopulos's harassment was so offensive and severe to create a hostile work environment, his conduct was not so egregious as to compel Tutman's resignation and establish constructive discharge.

III. Conclusion

For the foregoing reasons, we AFFIRM the grant of summary judgment.

/1   The parties agree that "bust a cap" and "pop a cap" means "to shoot" in gang parlance, but CBS maintains that Vasilopulos did not intend his remark as a death threat. Vasilopulos and Tutman appear to have been referring to the film Fear of

a Black Hat mistakenly as Niggers with Hats.