In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1996

TREMEYNE PORTER,

*Plaintiff-Appellant*,

*v.*

ERIE FOODS INTERNATIONAL, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:06-cv-50039—**Frederick J. Kapala**, *Judge*.

ARGUED JANUARY 7, 2009—DECIDED AUGUST 7, 2009

Before POSNER, RIPPLE AND ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Tremeyne Porter brought this action against Erie Foods International, Inc. ("Erie Foods"). He alleged race-based harassment, constructive discharge and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. The district court granted summary judgment to Erie Foods. Because Erie Foods took reasonable action to detect and to terminate the discriminatory activities of

the offending employees, we affirm the judgment of the district court.

# I

## BACKGROUND[1]

During the time period relevant to this appeal, Tremeyne Porter, who is an African-American, was an employee of Burton Placement Services ("Burton").[2] On July 19, 2004, he was placed by Burton as a temporary employee at Erie Foods' food production facility in Rochelle, Illinois. Mr. Porter worked the third shift[3] as a filler stacker under the supervision of Patricia Santos. On August 12, sometime after 11:00 p.m., a coworker took Mr. Porter to the "H-Line" production area, where a noose made out of white nylon rope was hanging on a piece of machinery, approximately twelve feet above the ground. Coworker Cody Matheny, allegedly smiling, was standing at his work station under the noose. Mr. Porter believed that he was being singled out because he was the sole African-American employee working the third shift,

---

[1] We construe all facts in favor of the nonmoving party, Mr. Porter. *See Marion v. City of Corydon, Ind.*, 559 F.3d 700, 704 (7th Cir. 2009).

[2] Prior to his placement with Erie Foods, Mr. Porter signed an agreement with Burton stating that he understood that he was a Burton employee. R.48, Def. Ex. 1 at 41-43.

[3] The third shift ran from 11:00 p.m. to 7:20 a.m.

and he found the noose to be a highly offensive symbol of slavery and the lynching of African-Americans.

Santos later went to the H-Line area and discovered the hanging noose. She directed Matheny to crawl up to the noose and take it down. She then asked him if he had hung the noose; he denied doing so. Santos next went to her office and placed the noose on her desk. She then made her rounds, checking to make sure that employees were at their proper places and that the machines were operating properly.

During this time, Mr. Porter approached Santos and told her that he believed that the noose was directed at him. She asked Mr. Porter if he knew who was responsible for the noose or why someone would hang it; he stated that he did not. Santos then asked Mr. Porter if he thought the perpetrator might be coworker Matheny, Earl Rooney or Blair Crumb. Mr. Porter told her that he did not. Santos told Mr. Porter that she would talk to Andy Goffinet in the human resources department and to her supervisor, Mark Jacobs. She also said that she would inform the first-shift supervisor, Darryl Emen, about the noose and see if he had heard anything from his employees.

Santos hung the noose on the bulletin board in her office; she says that she did this so that she would not lose it. Santos then returned to her rounds. The noose remained on the bulletin board for four hours, where it was visible to employees through a window in her office door. Mr. Porter later testified that Santos' act of hanging the noose on the bulletin board made him feel "betrayed"

because Santos "made it seem like she cared but in the end she didn't, because if she cared she wouldn't allow [him] to . . . see it hanging from somewhere else." R.48, Def. Ex. 1 at 152. He stated that he no longer felt comfortable talking to Santos. *Id.*

On the morning of August 13, sometime after 7:00 a.m., Santos took the noose off the bulletin board so that she could show it to Emen and Jacobs. She told them about what had happened and noted that Mr. Porter thought that the noose was directed at him. Neither Emen nor Jacobs knew who was responsible. After Santos finished speaking with them, she threw the noose away.

Between 8:00 a.m. and 9:00 a.m., Santos informed Goffinet about the noose and about Mr. Porter's remarks. Goffinet stated that he was very concerned and that he believed the matter needed to be addressed immediately. Goffinet then informed his supervisor, Jim Klein, of the incident.

That evening, Goffinet held a fifteen-minute meeting with Santos, Mr. Porter and all of the other third-shift employees. At the meeting, he discussed employee harassment and attempted to ascertain who was responsible for the noose. Goffinet told the workers that workplace harassment would not be tolerated and mentioned the company's anti-discrimination policy. Santos did not speak during the meeting, but, instead, watched the employees' faces in hope of learning who was responsible. After the meeting, Matheny told Goffinet that he was not the perpetrator.

Goffinet later spoke privately with nine of the fifteen third-shift workers. He also met individually with

Mr. Porter for approximately forty-five minutes. Mr. Porter told Goffinet that he did not feel comfortable talking to him because Goffinet previously had been convicted of abusing a minor and because Mr. Porter had been abused as a child. They had a "very emotional" conversation about Mr. Porter's family life. R.48, Def. Ex. 1 at 91. During the conversation, Goffinet asked Mr. Porter who was responsible for the noose; Mr. Porter told Goffinet that he would not say who made or showed him the noose because he did not want anyone to be fired. Goffinet concluded the meeting by handing Mr. Porter his business card and telling Mr. Porter that, if he ever wanted to talk to anyone, he could call him.

In another incident around this time,[4] coworker Felipe Alvarez showed Mr. Porter and some other employees a noose he had made. Alvarez testified that Mr. Porter laughed when he saw the noose, but Mr. Porter vigorously disputes this account and states that he felt threatened by it. In a separate incident, Alvarez gave Mr. Porter a noose in the locker room. During this incident, Alvarez told Mr. Porter that, if Mr. Porter showed the noose to anyone, Alvarez would come to Winnebago and look for him, which Mr. Porter interpreted to be a threat to his life and to his family. *Id.* at 85.

On August 15, Goffinet had another private talk with Mr. Porter. Goffinet asked Mr. Porter if he was ready to disclose who made the noose and who showed it to him.

---

[4] The record does not indicate the date when this event occurred.

Mr. Porter again declined to tell him, stating that he did not want anyone to lose his job. Goffinet then told Mr. Porter that he suspected that Matheny and Rooney were responsible. Mr. Porter claims that he nodded or made a statement confirming Goffinet's suspicions. R.48, Def. Ex. 1 at 95. Goffinet disputes this assertion; he claims that Mr. Porter made no reply and "continued to refuse to inform [him] of the identity of the person who made the noose, possessed it, displayed or hung it." R.48, Def. Ex. 8 at ¶ 6. Mr. Porter did tell Goffinet that he had been threatened by another employee, but did not identify the individual; Goffinet reported this development to Klein. He also asked Mr. Porter if he wanted to switch to a different shift, but Mr. Porter declined the offer. Goffinet subsequently followed up with Klein.

Santos asked Mr. Porter, on a nightly basis, whether he knew who had hung the noose. She also followed up with the first and second shift supervisors to ascertain if they had heard anything about the noose. Santos later spoke with Goffinet about his discussion with Mr. Porter and learned that there were "several other nooses out and about." R.48, Def. Ex. 4 at 77.

Mr. Porter contacted the Rochelle Police Department on August 14. He stated that he did not want to have anyone arrested, but that he did want to file an information report. R.48, Def. Ex. 10. He told the police that workers were making nooses and hanging them on the walls of the production floor and stated that employees would walk past him while swinging nooses. Mr. Porter also told the police that the human resources manager

at Erie Foods had held a meeting and that he would call back if the meeting ameliorated the situation. He further recounted Alvarez's threat and stated that Alvarez, Matheny and Rooney were responsible for making what he believed to be racial comments, such as calling him a "f---ing temp." R.48, Def. Ex. 1 at 104. Mr. Porter noted that the only action he wanted taken was to have the situation documented. He told the officer that he did not want the police to visit Erie Foods or the employees, but that he wanted the harassment to stop.

On August 15, while Mr. Porter was in the break room, Rooney and Matheny entered, singing "I wish you would die," and laughed. R.48, Def. Ex. 1 at 119. The next day, a locker fell on Mr. Porter while he was changing into his work clothes; suspecting that one of the other employees was responsible, he reported the incident to Santos. Santos went into the locker room to see the tipped-over locker; she also asked Mr. Porter if he knew who was responsible or who was in the room at the time the locker fell. Mr. Porter said that he did not know. She asked Mr. Porter if he had been injured, and he stated that he had been struck by the locker, but that he was unharmed. Santos reported the incident to Goffinet, who also looked at the lockers and had them bolted to the wall the next day.

Mr. Porter quit his job on August 19. Prior to his departure, he told Santos that he was planning on leaving because he felt that the people at Erie Foods were hostile toward him and that he did not feel safe working there. Santos told him that he could come to her about any problems and that he should let his employer,

Burton, know about his concerns. After Mr. Porter quit, he gave Burton a written statement about the problems that he had encountered at the Erie Foods plant, including the incidents with Alvarez and the various statements made by coworkers. This statement was faxed by Burton to Erie Foods on August 20. Mr. Porter also gave Burton the noose that Alvarez had given him. Erie Foods subsequently fired Alvarez for his behavior.

Porter then filed this suit under Title VII. The district court granted summary judgment to Erie Foods. Mr. Porter filed this timely appeal.

## II

## DISCUSSION

We review the district court's grant of summary judgment de novo and draw all reasonable inferences in favor of Mr. Porter, the non-moving party. *See Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co.*, 544 F.3d 752, 756 (7th Cir. 2008). Mr. Porter submits that he suffered harassment amounting to a hostile work environment, that he was constructively discharged and that he was terminated for engaging in a protected activity, all in violation of Title VII. We shall consider, in turn, each of these arguments.

### A.

#### 1.

We first turn to Mr. Porter's hostile work environment claim. The Supreme Court has held that harassment

which is "sufficiently severe or pervasive to alter the conditions of . . . employment" is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotation marks omitted). To survive summary judgment, an employee alleging a hostile work environment must show that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer[5] liability." *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

---

[5] Erie Foods does not seek to escape liability under Title VII on the basis that it is not Mr. Porter's employer. Nor would it appear that, under the circumstances presented here, such an argument would be persuasive. *See Reynolds v. CSX Transp., Inc.*, 115 F.3d 860, 869 (11th Cir. 1997) (rejecting the argument that the plaintiff could not recover against CSX because "she was technically employed by Olsten Temporary and not by" CSX, and observing that whether a company is an employer for purposes of Title VII is based on the "economic realities of the situation viewed in light of the common law principles of agency and the right of the employer to control the employee"), *rev'd on other grounds*, 524 U.S. 947 (1998). *See generally* EEOC Notice 915.002, *Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, December 3, 1997 (noting that "[a] client of a temporary employment agency typically qualifies as an employer of the temporary worker during the job assignment, along with the agency. . . . because the client usually exercises significant supervisory control over the worker").

Mr. Porter submits that he experienced unwelcome harassment because he was shown nooses on multiple occasions, subjected to unwelcome verbal harassment and threatened by Alvarez. He contends that the harassment was based on his race because he was the only African-American employee working the third shift and because nooses represent slavery and oppression. Mr. Porter emphasizes that the harassment made him fear for his own safety and for that of his family.

Mr. Porter maintains that sufficient evidence exists to hold Erie Foods liable for the acts of racial harassment committed by its employees. He claims that, after he complained to Santos, Erie Foods conducted only a minimal investigation and failed to prevent future discriminatory behavior. He emphasizes that Santos hung the noose on the bulletin board where it was visible to employees. Mr. Porter further argues that Goffinet conducted only a cursory meeting with the employees, failed to hand out or discuss the company's anti-discrimination policy and did not privately interview Matheny or Rooney. Mr. Porter further notes that, after the meeting, the harassment continued. In particular, he points to the incident where Alvarez threatened him.

Mr. Porter maintains that Erie Foods may be held liable, despite the fact that he did not report the subsequent harassment. In Mr. Porter's view, it was reasonable for him to not report this subsequent harassment because he did not trust Santos after the bulletin board incident and felt uncomfortable around Goffinet, who had been convicted in the past for sexual abuse of a minor. *See Vance*

*v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1513-14 (11th Cir. 1989) (holding that the plaintiff's failure to notify her employer about two nooses hung at her workstation because she was afraid did not insulate the employer from liability), *overruled on other grounds*, 983 F.2d 1573, 1581 (11th Cir. 1993). He claims that Erie Foods knew who was responsible for the harassment, but failed to suspend or terminate those individuals. Therefore, Mr. Porter argues that Erie Foods tolerated a hostile work environment instead of using its "arsenal of incentives and sanctions" to affect the conduct of its employees. Appellant's Br. 33 (citing *Dunn v. Wash. County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005)).

**2.**

The harassment that Mr. Porter experienced in this case was, undoubtably, based on race:

> The noose in this context is a symbol not just of racial discrimination or of disapproval, but of terror. Those of us for whom a particular symbol is just that—a symbol—may have difficulty appreciating the very real, very significant fear that such symbols inspire in those to whom they are targeted. No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear.

*Vance*, 983 F.2d at 1583 (Fay, J. dissenting). *See also* Temitope Oriola and Charles Adeyanju, *Haunted: The Symbolism of the Noose*, African Identities, Vol. 7, No. 1, at 91 ("The noose as an accoutrement of terror is essentially

about the 'place' of African-Americans in the United States."); *see generally* Lu-in Wang, *The Complexities of "Hate,"* 60 Ohio St. L. J. 799, 835-36 (1999) (discussing the psychological effect that lynchings have had on African-Americans). "Like 'a slave-masters whip,' the image of a noose is 'deeply a part of this country's collective consciousness and history, any [further] explanation of how one could infer a racial motive appears quite unnecessary.'" *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1159 (10th Cir. 2008) (quoting *Johnson v. Potter*, 177 F. Supp. 2d 961, 965 (D. Minn. 2001)) (alteration in original). The noose is a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs. *Williams v. N.Y. City Hous. Auth.*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) (citing Robert L. Zangrando, *The NAACP Crusade Against Lynching, 1909-1950*, at 4 (1980)). Given this backdrop, several courts have recognized that "a noose may constitute part of a hostile environment claim." *Tademy*, 520 F.3d at 1159 (collecting cases). In this case, the presence of multiple nooses and the veiled threats by Mr. Porter's coworkers, which caused Mr. Porter to fear for his own safety and that of his family, rose to the level of a hostile work environment.

We therefore turn to the question of whether there is a basis for employer liability. We have observed, on numerous occasions, that Title VII is not a strict liability statute. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000) ("[A]n employer is not strictly liable under Title VII for sexual harassment perpetrated by its employees"). Specifically, when a plaintiff, like Mr. Porter, "claims coworkers alone were responsible

for creating a hostile work environment, he must show that his employer has been negligent either in discovering or remedying the harassment." *Williams*, 361 F.3d at 1029 (quotation marks omitted). Stated another way, the employer can avoid liability for coworker harassment "if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman*, 209 F.3d at 1048; *accord Lapka v. Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008). Here, Mr. Porter does not argue that Erie Foods was negligent in discovering the noose hanging in the work area. Our focus, therefore, is on whether Erie Foods responded promptly and effectively to the incident. We believe the record establishes that Erie Foods' actions met this standard.

We have observed that a prompt investigation is the " 'hallmark of a reasonable corrective action.' " *Lapka*, 517 F.3d at 984 (quoting *Cerros v. Steel Techs, Inc.*, 398 F.3d 944, 953-54 (7th Cir. 2005)). Here, the steps taken by Santos and Goffinet after the discovery of the noose, taken as a whole, show that they took the harassment seriously and took appropriate steps to bring the harassment to an end. Immediately upon discovering the noose, Santos directed Matheny to take it down and inquired whether he was responsible for hanging it. When Mr. Porter came to Santos later that evening, she asked him if he knew who was responsible for the noose or why someone would hang it. Santos specifically inquired whether Mr. Porter thought the perpetrator might be Matheny, Rooney or Crumb; Mr. Porter told her that he did not know. Santos then informed Mr. Porter that she would talk to Goffinet and Jacobs about the

incident to see what follow-up should be done. She said that she would speak to Emen to determine if any workers during his shift knew anything about the noose. Santos, in fact, did speak to Emen and Jacobs upon their arrival at the end of her own shift. Santos also went to Goffinet and told him of the noose and of Mr. Porter's remarks.[6]

For his part, Goffinet expressed his concern and his intent to address the matter immediately. Goffinet first informed his supervisor, Jim Klein, of the incident. Additionally, that very evening, Goffinet held a meeting with all of the third-shift employees. Goffinet informed the workers that harassment in the workplace would not be tolerated; he also alerted the workers to the company's anti-harassment policy.

Goffinet later spoke privately with more than half of the third-shift workers. He also met individually with Mr. Porter. During their conversation, Goffinet specifically

---

[6] We do note, however, that one action taken by Santos—the placing of the noose on her office bulletin board—was ill-advised. Although there is no evidence in the record that Santos' motives were in any way illicit, this action, apparently taken to remind herself to report the matter to her seniors, also demonstrated a lack of recognition of the powerful message of racial hatred that a noose evokes. However, this misstep stands in contrast to Santos' otherwise diligent actions to bring the harassment to an end. Notably, Mr. Porter never reported this action to the company as a harassing event and, when the record is evaluated as a whole, it is clear that there is no basis for such a characterization.

asked Mr. Porter who was responsible for the noose; Mr. Porter declined to name any of his coworkers. At the end of the meeting, Goffinet gave Mr. Porter his business card and told Mr. Porter that he was available to talk with him at any time.

Mr. Porter faults Erie Foods for not taking further action against Matheny and Rooney once he had identified them as the perpetrators. According to Mr. Porter, during a second private meeting with Goffinet on August 15, Goffinet told Mr. Porter that he (Goffinet) suspected that Matheny and Rooney were responsible for the noose. Mr. Porter claims that he nodded or made a statement confirming Goffinet's suspicions. R.48, Def. Ex. 1 at 94. Although Goffinet disputes this assertion, at this stage, we must accept Mr. Porter's version of events as true.

In assessing the corrective action, our focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm. *Lapka*, 517 F.3d at 984. "Title VII requires only that the employer take steps reasonably likely to stop the harassment." *Saxton v. AT&T Co.*, 10 F.3d 526, 536 (7th Cir. 1993). Mr. Porter maintains that the steps taken by Erie Foods were ineffectual because the harassment did not cease; specifically, he points to the incidents in the break room on August 15 and in the locker area on August 16, as well as the threatening behavior by Alvarez. There is no question that a "stoppage of harassment shows effectiveness. . . . However, this is not the sole factor to be considered. Because there

is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998). In the present case, the only information Erie Foods initially had was that a noose was found hanging in the work area and that Mr. Porter believed that it was directed at him. In response, Santos made inquiries of her workers and fellow supervisor; she made repeated inquiries of Mr. Porter. In addition, Goffinet commenced an investigation; he met with the entire third shift, and he also met with Mr. Porter. After these actions had been taken, Mr. Porter did not report any new racial harassment at the hands of Matheny or Rooney.[7]

Mr. Porter had, of course, a duty to reasonably "avail [him]self of the employer's preventive or remedial apparatus." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The Court has explained that Title VII "borrows from tort law the avoidable consequences doctrine under which victims have a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute." *Penn. State Police v. Suders*, 542 U.S. 129, 146 (2004) (citations and quotation marks omitted). *See also Ford*

---

[7] During his second meeting with Goffinet on August 15, Mr. Porter did tell Goffinet that he had been threatened by another employee. However, Mr. Porter would not identify the employee or give any details about the nature of the threat. In response, Goffinet offered to move Mr. Porter to another shift, but Mr. Porter declined.

*Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (discussing a Title VII plaintiff's responsibility to mitigate damages). "If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care." *Faragher*, 524 U.S. at 807.

Mr. Porter seeks to excuse his lack of cooperation in the investigation of the noose incident, as well as his failure to disclose the serious problems he was encountering with Alvarez, because of Santos' handling of the noose[8] and because of Goffinet's personal history. However, we have noted that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 644 (7th Cir. 2000) (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) (discussing employee's burden to report harassment by supervisor)).[9]

Furthermore, the actions of both Santos and Goffinet, taken as a whole, show that they were prompt, serious

---

[8]  Mr. Porter faults Santos for placing the noose on her bulletin board while she was investigating. Specifically, Mr. Porter claims that this action caused him distress because the noose was visible to others.

[9]  Moreover, this case can be distinguished from *Vance*, 863 F.2d at 1513-14, in which the plaintiff's failure to notify her employer about two nooses hung at her work station did not insulate her employer from liability. In *Vance,* the plaintiff was concerned that management might be responsible for the nooses. *Id.* In contrast, Mr. Porter did not believe that his supervisors were responsible for the harassment.

and diligent in trying to weed out the offending behavior and allay Mr. Porter's concerns. Santos instituted an investigation, spoke with other shift leaders, attended the meeting with her shift and asked Mr. Porter every night whether he knew who had hung the noose. For Goffinet's part, he not only held the meeting with the third shift, interviewed third-shift workers[10] and met with Mr. Porter on two separate occasions, but he also offered to transfer Mr. Porter to another shift. *See*, *e.g.*, *Williams*, 361 F.3d at 1030 (noting that the court has found that separating the parties is "an appropriate remedy in race harassment cases").[11] Mr. Porter's reticence, therefore, does not excuse his failure to provide the detail necessary for Erie Foods to understand the nature of the harassment and to respond appropriately.[12]

---

[10] Mr. Porter also claims that management should have interviewed individually the prime suspects, Matheny and Rooney. This record provides us with little basis to fault the management in this respect. It was reasonable for management to want facts before confronting the prime suspects, and, partially due to Mr. Porter's reluctance to cooperate, those facts had not yet been assembled when Mr. Porter quit his job.

[11] Mr. Porter does not claim that transferring him to a different shift would have made him worse off. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000).

[12] Instead of reporting all of the harassers and harassing behavior to Erie Foods, Mr. Porter contacted the Rochelle Police Department. In this report, Mr. Porter not only explicitly identified the three individuals with whom he was having difficulty, he also described in detail the type of harassment

(continued...)

In sum, we cannot say that, on this record, a reasonable trier of fact could conclude that Erie Foods had been negligent in investigating or responding to the harassment of which it had knowledge. Accordingly, we must conclude that Erie Foods is not liable for the racial harassment experienced by Mr. Porter.

## B.

We next consider Mr. Porter's claim that he was constructively discharged on the basis of his race.[13] Ordinarily a plaintiff "is expected to remain on the job while seeking redress" for his employer's discriminatory actions. *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 427 (7th Cir. 2006) (citations and quotation marks omitted); *see also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007) (same). In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), the Supreme Court, while acknowledging explicitly that Title VII encompasses employer liability for constructive discharge, *id.* at 143, emphasized that, although a plaintiff may establish a hostile work environment by showing that he has been subjected to severe or pervasive harassment, *id.* (citing

---

[12] (...continued)
he was enduring. Although Mr. Porter certainly had the right to alert the police to the threatening behavior, it did not relieve him of the responsibility to make Erie Foods aware of these incidents.

[13] Because Mr. Porter's race discrimination theory is based on constructive discharge, we shall apply our constructive discharge precedent.

*Meritor Sav. Bank*, 477 U.S. at 67), a "further showing" is necessary to establish a constructive discharge, *id.* at 134. Specifically, the plaintiff "must show that the abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Id.* (quotation marks omitted); *see also Boumehdi*, 489 F.3d at 789 ("To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign." (citing *Suders*, 542 U.S. at 147)).

The present case presents a different situation than the one before the Supreme Court in *Suders*.[14] Mr. Porter does not contend that the harassment he endured was effectuated by his supervisors. Rather, he maintains that management's failure to take definitive action to stop the harassment justified his departure. In short, he contends that, although his coworkers were the ultimate

---

[14] In *Suders*, the Court made clear that the case before it "concern[ed] an employer's liability for one subset of Title VII constructive discharge claims: constructive discharge resulting from sexual harassment, or 'hostile work environment,' attributable to a supervisor." 542 U.S. at 143. Given this context, the Court continued, its "starting point" was the framework *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998), "established to govern employer liability for sexual harassment by supervisors." *Id.* The Court was careful to observe that "*Ellerth* and *Faragher* expressed no view on the employer liability standard for co-worker harassment. Nor do we." *Id.* at 143 n.6.

source of the harassment, it was the actions of management, or, more appropriately, the lack of management action that made his "working conditions so intolerable that [he had] no option but to resign." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 894 (1984) (cited in *Suders*, 542 U.S. at 142).

As we noted earlier, the constructive discharge test sets a high bar in order to give an employer an opportunity to address the situation before an employee resigns. *Boumedhi*, 489 F.3d at 789-90; *see also Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1035-36 (7th Cir. 2006) ("Working conditions for constructive discharge must be even more egregious than those that would support a finding of a hostile work environment; absent extraordinary circumstances, an employee is expected to remain employed while seeking redress.") (citing *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004)). We have no doubt that the conduct in this case was egregious, and we have previously found egregious conduct to be sufficient to support a claim for constructive discharge.[15] Here, the

---

[15] *See Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (recognizing that a jury could find constructive discharge where the plaintiffs' supervisor made several racist comments, fondled one plaintiff and held a gun to another plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 416-17, 423-24 (7th Cir. 1989) (holding that constructive discharge was established after "repeated instances of grossly offensive conduct and commentary" that culminated in an incident where a coworker showed the plaintiff a racist pornographic

(continued...)

allegations include repeated use of a noose—perhaps the ultimate symbol of racial hatred and hate crimes—combined with implied threats of physical violence. Such conduct clearly qualifies as egregious for purposes of constructive discharge.

Nevertheless, in determining whether a plaintiff may recover for a constructive discharge, we also must assess the employer's response to that conduct. We believe that, on the facts presented here, a jury would have to conclude that Erie Foods' response was a reasonable one. There is no question that Erie Foods had a means in place for remedying complaints of workplace harassment, that Mr. Porter initially availed himself of that procedure, that his complaint set in motion an investigation of his claim and that management informed the entire third shift that discriminatory conduct would not be tolerated.

Additionally, both Santos and Goffinet followed up with Mr. Porter. Indeed, when Mr. Porter informed Goffinet that he had been threatened by another, unidentified coworker, Goffinet offered to move Mr. Porter to a different shift. Despite management's efforts to both root out the offenders and to shield Mr. Porter from the offending behavior while the investigation was ongoing, Mr. Porter did not report additional harassment by Rooney

---

[15] (...continued)
photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her).

and Matheny, did not identify Alvarez as the other harasser and did not avail himself of the opportunity to change shifts. Given the efforts that Erie Foods' management made to address the harassment, a reasonable employee would have given his employer a further chance to remedy the workplace harassment. *See Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (stating that "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints and whether it was likely that the harassment would continue" and noting that the plaintiff's constructive discharge claim was undermined by the management's swift response to her complaints).

In sum, Erie Foods diligently investigated Mr. Porter's sole complaint of race-based harassment. Nevertheless, when Mr. Porter continued to be harassed, he did not use the means available to him to remedy the situation. Consequently, Erie Foods has defended itself successfully against Mr. Porter's constructive discharge claim.

## C.

Finally, we consider Mr. Porter's claim that Erie Foods retaliated against him for engaging in a protected activity. An employee can establish a prima facie case for retaliation under either the direct or indirect method. *Roney v. Ill. Dept. of Trans.*, 474 F.3d 455, 459 (7th Cir. 2007). Mr. Porter proceeds under the direct method, which requires him to show that: (1) he engaged in a statutorily protected activity; (2) an adverse action was taken against him

by his employer; and (3) there is a causal connection between the two. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007).

Mr. Porter submits that he suffered from unlawful retaliation for opposing impermissible race-based discrimination. He maintains that he engaged in a protected activity when he complained about the noose on display over the H-line. He further contends that he suffered an adverse employment action when he was constructively discharged. Mr. Porter argues that there is a causal link between his complaints and the constructive discharge, because management failed to remedy the harassment and, therefore, forced him to leave.

As we discussed earlier, we do not believe that Mr. Porter was constructively discharged. There certainly is no showing that Erie Foods ignored or slowed its investigation after the initial complaint in the hope that the continued harassment would cause Mr. Porter to leave. The record shows that Erie Foods took appropriate action to address Mr. Porter's complaint. There is no evidence in the record that it failed to take Mr. Porter's complaint seriously. We therefore cannot conclude that Erie Foods retaliated against Mr. Porter.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

ROVNER, *Circuit Judge,* concurring. As my brethren aptly point out, a noose is one of the most potent symbols of racial oppression—a symbol of terror and violence. A person who realized the power of that message, upon discovering it, would condemn it to a dark hidden place where it could do no further harm. After removing the noose from the production area of the H line, however, supervisor Santos took that message of terror, threat, and violence and relocated it on the bulletin board in her windowed supervisor's office where it was visible to all employees. The majority describes this act as "ill-advised"—an understatement for sure. At its best, Santos' act sent the message that she had no idea of the potency of the message and, as a result, would either fail to take the harassment seriously or would bungle the investigation as she had the efforts to remove the offending communication. At worst, her re-broadcast of the noose sent a message that she sided with the harassers.

The majority credits Santos' testimony that she placed the noose on the bulletin board so that she would not lose it and to remind herself to report the matter to her supervisors, both of which are odd excuses for a bulletin board display of a symbol of lynching black men. A drawer, a purse, a file cabinet, or a box would all keep the evidence safe, and Santos' concerns about forgetting to report the event simply reinforces my best-case-scenario hypothesis—that Santos failed to understand the gravity of the harassment. Furthermore, four hours later, after showing the noose to her supervisor and the first shift supervisor, she threw that noose that she was so fearful of losing into the garbage. By doing so, she

failed to preserve it for future investigation by human resource personnel or other higher ranking company supervisors.

We need not determine Santos' intentions. Whether an intentional perpetuation of the harassment or simply an "ill-advised" misstep, as the majority characterizes it, the company had an obligation to correct the harm. The failure to take corrective action in such a case simply cannot be "reasonable action" as a matter of law. It appears, however, that Porter never complained to the company about this particular harassing event. He mentions it in this appeal as a means of excusing his failure to name the perpetrators of the harassment, arguing that the act made him feel uncomfortable about talking to his supervisor about the event. As the majority points out, under the framework set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775, 806-07, 118 S. Ct. 2275, 2292 (1998), Porter had a duty to avail himself of his employer's remedial apparatus in some manner. *See also Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005). Had he done so, "reasonable action" would have required the company to take prompt and decisive action to correct that harm.

The majority concludes in footnote 6 that, "when the record is evaluated as a whole, it is clear that there is no basis for" characterizing the noose in the supervisor's office as harassing. Ante at p. 14, fn.6. I disagree. Nevertheless, Porter never reported this particular act of harassment and Porter points to no evidence that any of the managers saw the noose in her office, so the com-

pany cannot be liable for its failure to take reasonable action.

Furthermore, the majority accurately notes that Santos and Goffinet removed the original noose promptly, immediately held a meeting for all shift workers informing them of the company's harassment policy and reinforcing that the company would not tolerate harassment, interviewed the majority of the shift's employees, held several meetings with Mr. Porter to ferret out the culprit, and offered to transfer him to another shift.[1] Their efforts indeed may have been hampered by Porter's reticence to co-operate in the investigation and his failure to report all of the incidents that he now claims contributed to the harassment. I agree with the majority that the company's actions, taken as a whole, were sufficient to allow a rational trier of fact to conclude that the company took reasonable steps to stop the harassment and prevent future harm, despite Santos' serious error. *See Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008), *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 535-536 (7th Cir. 1993).

---

[1] In the usual case we would expect the employer to remedy the harassment by inconveniencing the harasser with a transfer and not the victim. *See, e.g., Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1030 (7th Cir. 2004). In this case, however, since the company never identified the harasser with any confidence, and because we do not know whether the transfer would have been better or worse for Porter, it is legitimate to accept as remedial Goffinet's offer to transfer Porter.

I would stop short, however, of the majority's description of Santos' efforts as "diligent."