In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3891

BRENDA PATTON,

*Plaintiff-Appellant,*

*v.*

KEYSTONE RV COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 03 C 411—**Robert L. Miller Jr.**, *Chief Judge.*

ARGUED MAY 5, 2006—DECIDED AUGUST 1, 2006

Before KANNE, WOOD, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* This appeal requires us to determine whether the facts of this employment discrimination case constitute an objectively hostile work environment supporting a claim of constructive discharge. The district court thought the case fell short of a hostile work environment, and, therefore, granted summary judgment for the employer. We disagree, and remand for trial.

## I. HISTORY

What follows are the facts present in the summary judgment record, taken in a light most favorable to Patton,

with a focus on the issue of hostile work environment.[1]
Keystone RV Company manufactures high-end recreational
vehicles ("RVs"), some of which come fully equipped with
bedrooms, kitchens, and all the other amenities of a home.
Brenda Patton began her employment with Keystone in
April of 2001 at its Elkhart, Indiana location.

At the Elkhart plant, Patton's immediate supervisor
was Joe Solis, a group leader. Solis reported to Glen Miller,
an assistant plant manager, who in turn reported to the
Elkhart plant manager, Keith Weaver. Rod Ramey, the
alleged harasser, was the manufacturing manager
who oversaw a number of Keystone's plants, including those
in Elkhart and Goshen (where Patton was eventually
transferred). Ramey's job was to ensure product quality,
and to that end he could take any personnel action against
the employees at the plants he supervised.[2]

Patton says the harassment began in October of 2002,
with Ramey telling her, "Did you know that we are fucking
according to the rumor over in Goshen?" There was no
affair, as Patton had never before had a conversation
with Ramey, and only knew him in passing. Patton re-
sponded by saying, "That's not very nice." Shortly there-
after, Ramey began to question Patton about whether she

---

[1] The parties dispute whether it is proper for us to rely on
Patton's affidavit, which was struck, at least in part, by the
district court. We need not definitively address the issue be-
cause even when disregarding the facts in the affidavit (as we
have) it was still error to grant summary judgment.

[2] It is undisputed that Ramey was Patton's supervisor for
purposes of Keystone's liability under Title VII. *See Rhodes v.
Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004) (explain-
ing that "[a] supervisor is someone with the power to *directly*
affect the terms and conditions of the plaintiff's employment")
(emphasis in original) (citing *Parkins v. Civil Constrs. of Ill., Inc.*,
163 F.3d 1027, 1034 (7th Cir. 1998)).

was having an affair with Solis, and informed her that if it were true the two would not be allowed to work together.

Part of Ramey's job was to monitor work performance, which at times required him to "hover" around individual employees. Patton, however, felt that Ramey was doing more than monitoring her work. She thought Ramey was always leering at her, staring at her body as she knelt, crouched, and bent over while working in the RVs. She also thought that Ramey spent an inordinate amount of time around her. This account was corroborated by Miller (the assistant plant manager), who averred that Ramey spent an unusual amount of time around Patton. Miller thought Ramey "seemed obsessed" with Patton and "acted like a disturbed man" around her.

Ramey also touched Patton inappropriately. The first (and most serious incident) occurred when she was wearing shorts, crouching in the doorway of a nearly finished RV. As she finished cleaning that portion of the vehicle, she spun around, legs open to the outside. Ramey was standing there, presumably observing her work, and he slid his hand under Patton's shorts, up her inner thigh, while commenting that her legs were smooth. His hand went as far as her underwear, at which point Patton fell backwards to break the contact. On another occasion, Patton was on her knees cleaning the floor of an RV and was working backward toward the door to the outside. Ramey was standing right outside of the RV, and he put his hand on her calf as she reached the doorway. Another incident occurred in the bedroom area of an RV. As Patton was squatting down to repair carpet, Ramey crouched down behind her and put his arm on her back with his hand near her neck. He then placed his face quite close to her ear and told her to meet him for a drink. Patton declined and squirmed away from him.

After the first instance of physical contact, Patton began to have panic attacks. Moreover, she became very nervous whenever Ramey was around her. She was worried all the time at work that Ramey would "sneak up" and touch her. She felt that her work environment was unsafe and she spent her days in fear, looking over her shoulder for Ramey. Nevertheless, Patton also testified at her deposition that the stress did not affect her ability to do her job in a timely manner. In fact, she thought the stress made her work harder and faster.

At the time of these events, the Elkhart plant was in the process of being phased out and all of its employees were either being terminated or moved to a new plant in Goshen. In November of 2002, Patton was told that Ramey wanted her to transfer to Goshen. She was not happy about the assignment because it would interfere with her children's daycare schedules. Patton also felt that a transfer to Goshen would mean more contact with Ramey. She thought the transfer "was a sexual thing and [Ramey] wanted [her] close to him." She requested to stay at Elkhart, but Ramey refused. When she first reported to work at Goshen on a Monday morning, Ramey was waiting at the door to greet her. He put his arm around her waist, letting his hand fall down toward her buttocks, and guided her while saying "you sure brighten up the place."

Not everyone at Goshen was so happy to see Patton. Another employee had been demoted because of Patton's arrival. An angry confrontation ensued on Patton's second day of work, with that employee claiming that Patton was being favored because of a sexual relationship with Ramey. After this incident Patton went to Miller (who had previously been transferred to Goshen) crying. He advised Patton to go back to the Elkhart plant to discuss the situation with Weaver. Patton left for Elkhart, but she was afraid she might run into Ramey. So instead of just going into the plant, she went to a security checkpoint

outside of the plant and asked them to call for Weaver to come meet her. Weaver did not come, but Ramey did, and he told her to go back to work at the Goshen plant. Patton went home, and never returned to work at Keystone.

## II.  ANALYSIS

We review the district court's grant of summary judgment de novo, viewing all facts in the light most favorable to Patton. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). We are asked to decide whether Patton was subjected to a "hostile work environment," and, if so, whether that environment was sufficiently egregious so as to justify a finding of constructive discharge.

Title VII protects against employees being subjected to a workplace so permeated with harassment on the basis of sex that the conditions of employment are altered and a "hostile" (or "abusive") work environment is created. *Id.* at 902 (citations omitted). "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

The district court assumed Patton subjectively found her workplace to be hostile, and Keystone does not take issue with that ruling. Thus, our only task is to determine whether a reasonable person would have considered Patton's work environment hostile. We perform that task by evaluating all the circumstances. *Harris v. Forklift Sys., Inc*, 510 U.S. 17, 21-23 (1993).

Not all offensive conduct violates federal law; Title VII is not a civility code. *Hostetler*, 218 F.3d at 807 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

A hostile work environment is created when the conduct at issue is "sufficiently severe or pervasive to alter the conditions of the [victim's] employment and create an abusive working environment." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (internal quotations omitted)). Our precedent provides some guidance on how to evaluate the severity of harassment:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers . . . .

*Bakersville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted). One very severe act of harassment might create a hostile environment, *Hostetler,* 218 F.3d at 808, but that would be the rare case. In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment.

The conduct alleged in this case occurred over the course of approximately one month and consists of (1) four instances of physical contact, (2) a few sexually charged comments, and (3) alleged stalking. The most serious of these is the inappropriate touching. When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their body is usually not one of them. With that being said, it is certainly true that "[p]hysical harassment lies along a continuum just as verbal harassment does." *Id*. The mere existence of physical contact does not create a hostile environment. Casual contact that might be expected among friends—"[a] hand on the shoulder, a brief hug, or a peck on the cheek"—would normally be

unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection. *Id.* And "[e]ven more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks— may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *Id.* (citations omitted). But when the physical contact surpasses what "(if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." *Id.*

It is very important to focus intently on the specific circumstances of physical harassment—a kiss is not necessarily just a kiss. As we have noted, there is a difference between a peck on the cheek and a kiss on the lips. And there may be circumstances surrounding a kiss on the lips that distinguish it greatly from the kind of inappropriate, but not egregious physical contact that is insufficient, in isolation, to create a hostile environment. *Hostetler* is a good example: the "co-worker did not simply steal a quick kiss from [the plaintiff's] lips, but, holding her face in his hands, forced his tongue into her mouth." *Id.* at 809. The factual nuances can be significant with any type of harassment, but this is especially so with instances of physical contact, which have the potential to be among the most severe and psychologically damaging types of sexual harassment.

In granting summary judgment for Keystone, the district court relied upon cases of ours illustrating the middle part of the continuum of physical harassment: acts such as a hand on the thigh, which, though inappropriate, do not constitute actionable harassment so long as they occur in isolation. Here, two instances of physical contact—the touch of Patton's leg, and the arm around the waist while walking her into the Goshen plant—likely

fall into this middle category. But the instance where Ramey put his hand up Patton's shorts does not.

The conduct described by Patton was not a mere touching of the thigh; Ramey (according to Patton) ran his hand all the way up her inner thigh, under her shorts until he touched her underwear, at which point Patton was able to break the contact. "We have previously recognized that direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (citations omitted). In *Worth*, we held that the touching of the "breast near the nipple for several seconds is severe enough" to constitute a hostile environment by itself. *See id.* Keystone states in a conclusory manner that what Ramey did to Patton was not as severe as what happened in *Worth*, but we do not think there is any relevant difference. The record establishes that Ramey's hand was under Patton's shorts, on her inner thigh, and touching her underwear. If Ramey touched her vagina, then his conduct would constitute not only actionable sexual harassment but possibly criminal sexual assault as well. But even if he did not go that far, viewing the facts in the light most favorable to Patton, Ramey's hand was on Patton's inner thigh, under her shorts, and very near her vagina. We have no difficulty describing that as contact with an "intimate body part," as the term was used in *Worth*.

Putting aside the definition of "intimate body part," this intentional physical intrusion in such close proximity to the most intimate areas of a person's body cannot be disregarded as a "pedestrian annoyance." *Hostetler*, 218 F.3d at 808. Nor is it the sort of middle-of-the-continuum physical contact we have held insufficient in isolation to constitute a hostile environment. *See, e.g.*, *McPherson v. City of Waukegan*, 379 F.3d 430, 434, 439 (7th Cir. 2004) (fact of supervisor pulling back plaintiff's shirt once to see the type of bra she was wearing insufficient); *Hilt-Dyson v. City of*

*Chicago*, 282 F.3d 456, 459, 463-64 (7th Cir. 2002) (supervisor's rubbing of back and shoulders, which ceased after plaintiff complained); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) ("four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 706-08 (7th Cir. 1995) (one instance where supervisor rubbed foot against plaintiff's leg and another where he grabbed plaintiff's buttocks); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (assuming, despite contradictory deposition testimony, that two attempts by a supervisor to kiss the plaintiff were insufficient).

Ramey's groping of Patton under her shorts might be sufficient alone to create an abusive working environment. But it was not the sole act. Ramey had already raised the alleged rumor of a sexual affair between himself and Patton. At least two people—Patton and Miller—agreed that Ramey leered at her in an obsessive manner. And on three more occasions he exploited the proximity to Patton provided by his managerial position to touch her. Significantly, one of these acts occurred in the isolated back bedroom of an RV. Ramey approached Patton from behind, squatted down behind her, put his arm on Patton's back with his hand up by her neck, and whispered into her ear his desire to have a drink with her. We think these facts, when considered in their totality, easily make reasonable Patton's constant fear that while she was working alone in the RVs Ramey would "sneak up" and touch her in a sexual manner or worse. A reasonable jury could find that Patton was subjected to a hostile work environment.

That does not end our analysis. We must also consider whether this hostile environment resulted in a constructive discharge. "The 'working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is

expected to remain employed while seeking redress.'" *McPherson*, 379 F.3d at 440 (quoting *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)). To maintain a claim for constructive discharge, Patton must show that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (citations omitted).

We have previously held that a "credible death threat that signals grave danger to the plaintiff's bodily integrity . . . can constitute grounds for finding constructive discharge." *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citations omitted). While that statement is certainly not meant to set a floor, its focus on serious physical harm to one's body is illustrative of one general circumstance meeting this higher standard for harassment. When it becomes reasonable to fear serious physical harm, it becomes reasonable to quit immediately rather than seek redress while on the job. *See, e.g.*, *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1198-99 (7th Cir. 1992) (finding constructive discharge where harassment included a supervisor brandishing a pistol and holding it to the plaintiff's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir. 1989) (finding constructive discharge where severe harassment culminated with a co-worker grabbing the plaintiff and threatening to kill her).

We think this case, while possibly falling short of the conduct in *Taylor* and *Brooms*, meets the standard for a constructive discharge. The picture painted here is not that of an employee offended by a boorish supervisor, or even that of an employee having his or her emotional resolve seriously chipped away on a daily basis by a working environment riddled with sexual harassment. This case presents more: a reasonable fact finder could agree with Patton's fear that her supervisor was an obsessed man

who—based on previous acts showing no regard for Patton's right to control who could touch intimate areas of her body—was capable of, and desirous of, physically assaulting her in a serious way. We need not conclude that a rape or other assault was likely, but only whether a reasonable fact finder could find that Patton should have quit immediately to protect herself. We think the answer is yes.

### III.  CONCLUSION

Accordingly, we REVERSE the grant of summary judgment and REMAND for trial.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*