In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1539

SAM STAMEY,

*Plaintiff-Appellant,*

*v.*

FOREST RIVER, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:19-cv-250 — **Damon R. Leichty**, *Judge.*

ARGUED NOVEMBER 16, 2021 — DECIDED JUNE 17, 2022

Before BRENNAN, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Sam Stamey installed wiring in cargo trailers at Forest River, Inc.'s plant in Elkhart, Indiana for over ten years. He resigned in August 2018 at age 62 and then sued Forest River alleging that the company constructively discharged him in violation of the Age Discrimination in Employment Act by refusing to address a relentless and ruthless campaign of age-based harassment undertaken by

his coworkers. The district court saw the facts differently and entered summary judgment for Forest River.

We reverse. While this case is close, what tips it to trial is the requirement at summary judgment that we view the facts, and draw all reasonable inferences, in Stamey's favor. If we credit his account that—in less than a year—his coworkers hurled upwards of 1,000 age-based insults at him without management taking effective steps to end the misconduct, a jury could return a verdict in Stamey's favor. On the other hand, if Forest River shows that Stamey's account lacks credibility, the company may prevail. Our role is not to weigh evidence or resolve factual disputes—it is up to the jury to decide.

## I

### A

Sam Stamey began working at Forest River in October 2007 at age 51. He accumulated a strong work record, receiving several raises and avoiding any discipline.

Stamey maintains that his coworkers began harassing him in the fall of 2017, when he was 61. The alleged harassment continued for roughly 10 months and took two forms. *First*, there was verbal harassment, which Stamey described as escalating to the point where he "caught old age insults practically every morning on [his] way into the building, when [he] left for the day, during breaks, and whenever [he] walked into other parts of the plant." The insults included comments that either explicitly or implicitly referred to Stamey's age, with coworkers calling him "Walmart greeter, grandma, old b----, and a lot more stuff." Coworkers also asked questions like "You still alive? What the F?"; "When the f--- you retiring?";

"What's up homo? Looks like your dentures are about to fall out."; and "What are you doing here? I thought you died last week." When asked in his deposition, Stamey estimated that he received around 1,000 insults between late 2017 and early 2018. By the end of his time at Forest River, he believes approximately two dozen coworkers had participated.

*Second*, the alleged harassment went beyond the verbal and included acts to interfere with Stamey's work. His coworkers repeatedly defaced his workstation, including by writing profanity on his tool cabinet, in the bathroom, and around the plant, and zip tying his tools together. At different times, unidentified coworkers taped or glued his tool cabinet shut; screwed it closed and stripped the screw heads; and drove screws into the wheels of his wire cart, immobilizing it. On one occasion, Stamey had to spend 45 minutes prying his cabinet open. Another time, he found undercoating sprayed on his lunch plate. Still more, someone once cut the power cord to his new electric coffee maker in several places, exposing its wiring. Sometime after the alleged harassment began in 2017, Stamey's fiancée called Jeff Rowe in Forest River's human resources department to report the misconduct. Rowe suggested that Stamey contact Wendy Tubicsak, who also worked in HR. Stamey did so, leaving Tubicsak a voicemail message. But he then never heard back from her.

Stamey next turned to his supervisor, Frank Pontius. Stamey testified that he and Pontius had approximately 10 conversations over about two months in late 2017 about the alleged harassment. For his part, Pontius reacted to the complaints by conferring with another manager who, in turn, told Stamey that the harassment would stop. Stamey acknowledges that the insults and related disruptions with his

workspace and tools did stop for a week or two. But they then resumed.

After Pontius died, Mike Brady became Stamey's new supervisor in January 2018. When the alleged harassment resumed, Stamey had two or three conversations with Brady and gave him the names of those coworkers who had leveled the worst, most insulting age-based comments. Stamey also told Brady that he believed these same coworkers were responsible for defacing his workstation and spray-painting derogatory comments around the plant. Brady responded by telling Stamey that, without certainty about the identity of the perpetrators, he could not help.

Nothing much changed through the end of 2017 and into early 2018. In the spring of 2018, Stamey tried once more to get help from management but again received little relief. He brought pictures of some of the alleged physical harassment to Forest River's corporate office and asked to speak with Tubicsak in HR. Finding her out of the office, Stamey left her a voicemail message informing her once again of the ongoing harassment. Without responding directly to Stamey, Tubicsak did call plant manager Scott McDonald and asked him to follow up. McDonald did so the next day by approaching Stamey.

Stamey showed McDonald some of the graffiti and described not only the profane insult written on the bathroom wall, but also what he kept finding at his workstation, including his tool cabinet being taped or screwed shut. McDonald told Stamey that he "shouldn't have gone over his head" by complaining to Tubicsak in HR. McDonald later spoke to Stamey's supervisor (Mike Brady), several plant workers, and other supervisors, telling them that the "horseplay" must end,

but stopping short of threatening any consequences if it persisted. Stamey was not present during that conversation and was never told about it. McDonald apparently took no step to confirm the harassment had stopped or to monitor the situation, and indeed he later testified that he never learned that it resumed.

The alleged harassment nevertheless persisted and, in June 2018, Stamey filed a charge of discrimination with the Equal Employment Opportunity Commission. He alleged "co-workers have insulted, taunted, and tormented [him] on account of his age." Forest River reacted by itself investigating and concluding that "there are no facts to support [Stamey's] allegations."

By Stamey's account, the alleged physical harassment stopped after he filed his EEOC complaint, but the verbal harassment continued and indeed grew more frequent. Stamey then appealed to his supervisor Brady one last time. As before, Brady said that he could do nothing without certainty as to the perpetrators—despite Stamey identifying a few of the "workers who seemed to be the worst offenders."

Stamey alleges that he suffered emotionally and physically because of his coworkers' behavior. He had trouble eating and sleeping, dreaded going to work, felt depressed and humiliated, and found his hands shaking while at home. He testified that the last straw came on August 10, 2018, when a supervisor in another department taunted him in front of his coworkers by quipping: "Damn, Sam, you still kicking? You've got one foot in the grave and the other on a banana peel!"

Stamey quit that day. Mike Brady, Stamey's supervisor, called him and told him to come back because he still had his job. Stamey did not do so and instead later filed a second charge of discrimination with the EEOC.

B

Stamey sued Forest River, alleging that the company constructively discharged him in violation of the Age Discrimination in Employment Act. See 29 U.S.C. § 621 *et seq*. Following discovery, the district court granted Forest River's motion for summary judgment. It concluded that Stamey could not show his working conditions to be so intolerable that a reasonable person would have been compelled to resign. The district court also determined that Stamey acted unreasonably in assuming that the company's management would not help him further.

As for the working conditions, the district court reasoned that, although "the harassment here is worse than other cases" in which summary judgment was warranted on a constructive-discharge claim, it was not "nearly as egregious" as in constructive-discharge cases that went to a jury. Rather, in the district court's view, the "name calling may have been humiliating," but "[n]one of the comments were made by Mr. Stamey's direct supervisors" and the alleged physical harassment was best seen as "physical pranks" with "a more attenuated connection to age, if any at all."

From there the district added that a reasonable person in Stamey's position would not have quit, but instead tried another time to get help from Forest River management. Stamey's own assumption "that his supervisors would be of no help to him," the district court determined, was unreasonable

"particularly when Forest River's system of handling complaints had worked, on occasion perfectly well and on other occasions less well" and that it had never proved "futile" to make a complaint. Because there was no "extraordinary condition here," such as a threat of violence, a "scheme to accuse him of a crime" or "resounding silence in the face of myriad complaints," the district court concluded that Stamey was not constructively discharged. So it entered summary judgment for Forest River.

Stamey now appeals.

## II

We owe no deference to the district court's view of what findings and inferences the factual record permits. To the contrary, our obligation is to take our own fresh look at whether Stamey has identified genuine disputes over facts material to the resolution of his constructive discharge claim. See Fed. R. Civ. P. 56(a); see also *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020). In doing so, we must draw "all justifiable inferences" in the favor of Stamey, the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A

The Age Discrimination in Employment Act prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Its protections are "limited to individuals who are at least 40 years of age." *Id.* § 631(a). An ADEA plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for'

cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

Here, Forest River did not discipline or fire Stamey. This explains why he proceeds under the theory of constructive discharge—that the company effectively fired him by subjecting him to unbearable age-based harassment. Ordinarily, of course, employers can expect their employees to remain on the job and seek redress from workplace misconduct. See *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). A constructive discharge occurs in the extraordinary case when an employee suffers "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004).

This is a high hurdle for Stamey to clear. He must first show "working conditions even more egregious than that required for a hostile work environment claim." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Serious threats to an employee's physical safety meet this burden. See, *e.g.*, *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006) (recognizing that "[w]hen it becomes reasonable to fear serious physical harm, it becomes reasonable to quit immediately rather than seek redress while on the job"). But threats of serious physical harm are only "one general circumstance meeting this higher standard of harassment." *Id.* Indeed, we have recognized that there was enough evidence to overcome summary judgment when a plaintiff "alleged a repeated pattern of offensive conduct by her supervisor, retaliatory actions after she complained to human resources, and her employer's general failure to respond despite repeated complaints." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007).

Egregious working conditions alone are not enough to prevail on a constructive discharge claim, however. The law requires the employee to go further by showing that seeking redress from the employer would be futile. See *id.* An employee who, though not in immediate danger, quits without notifying the employer of the egregious harassment has acted unreasonably and has not been constructively discharged. See *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639–40 (7th Cir. 2009). Similarly, no constructive discharge occurs if the employer responds diligently, and the employee quits despite a reasonable prospect that further complaints could lead to a resolution. See *id*. But if the employer "had numerous opportunities to respond to the situation" and failed to do so, with the "alleged complaints [falling] on deaf ears," a jury may find that the employee had no means other than quitting to prevent the harassment and thus was constructively discharged. *Boumehdi*, 489 F.3d at 790.

## B

A jury could find that the harassment Stamey experienced was egregious enough to meet the high threshold of constructive discharge. For nearly a year, coworkers showered Stamey with verbal, age-based insults throughout the day—including "old b----," "Walmart greeter," "grandma," and "old man." This unrelenting alleged verbal harassment swelled to include, by Stamey's estimate, over 1,000 insults that, when coupled with coworkers interfering with his workspace and writing vulgar graffiti around the plant, eventually had physical effects on Stamey. He described how "[his] nerves had become shot," "[he] couldn't sleep," "[his] hands would shake," "[he] dreaded going to work," "[his] stomach was upset," "[he] couldn't eat," and "[he] felt depressed and humiliated."

Our 2007 decision in *Boumehdi* is instructive. We concluded there that Julie Boumehdi had identified a "repeated pattern of offensive conduct"—including her direct supervisor making at least 18 sexist and offensive remarks over the course of 10 months and threatening retaliation if she reported anything to management. When Boumedhi did complain to HR, management did nothing to intervene and address the harassment. 489 F.3d at 786, 790. Right to it, we saw the facts as permitting a jury to "conclude that a reasonable person in Boumehdi's position would feel she had no choice but to resign." *Id.* at 790.

We see the facts here in a similar way. A jury could conclude that Stamey's working conditions were as egregious as those in *Boumehdi*. *First*, Stamey endured more frequent and pervasive verbal harassment: he estimates that he received at least 1,000 age-based taunts over the course of nearly a year, often several in a day, from dozens of people. Not all of the comments explicitly reference Stamey's age and, indeed, many have sexual or homophobic undertones. But a jury could reasonably infer that they were part and parcel of the age-based harassment campaign—they were often closely linked and targeted at the plant's oldest employee. To be sure, the individual comments in *Boumehdi* were qualitatively worse than those here, and there is a difference between statements made by a supervisor and those made by a coworker. See *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004). But there is also a difference between 18 comments from one source and upwards of 1,000 coming from all directions. One thousand is a huge number when the measure is workplace, age-based insults.

*Second*, the sexist, insulting conduct that Julie Boumehdi faced was all verbal. Stamey also contends that he had to endure humiliating graffiti in the workplace and regular interference with his workspace and tools. Again, a jury could see these acts hand-in-glove with the pattern of verbal age-based insults that Stamey endured at Forest River. If it credits Stamey's account, a jury could tally all of this evidence and conclude his working conditions were sufficiently egregious to give rise to a constructive discharge.

## C

Drawing every inference in Stamey's favor, as we must on summary judgment, a rational jury could also conclude that a reasonable person in his position would have believed it futile to continue seeking help from Forest River. See *Porter*, 576 F.3d at 640; *Boumehdi*, 489 F.3d at 790. On this score, the judgment call is close.

A jury could reasonably find that Forest River had sufficient notice of the harassment and its continuation after Stamey complained to the EEOC in June 2018. Before he filed his complaint with the EEOC, Stamey and his fiancée spoke to at least five people about the alleged harassment: Jeff Rowe and Wendy Tubicsak in HR; Frank Pontius, Stamey's original supervisor; Mike Brady, his new supervisor; and Scott McDonald, the plant manager.

We also see the record as permitting a finding that Stamey spoke to Brady after filing his charge with the EEOC about the relentless and indeed worsening verbal insults. This point requires some unpacking because the district court viewed the summary judgment record a different way.

At one place in his deposition, Stamey answered "no" to the general question "did you go to your supervisors to talk between June of 2018, when you filed your first complaint, and when you quit?" But later in the same deposition, when asked specifically, "after you filed your charge of discrimination in June, did you have any conversations . . . with [your supervisor] Mike Brady about how things were getting worse?" Stamey answered "[y]es." He echoed the same point in an affidavit he submitted as part of opposing Forest River's motion for summary judgment, stating that "[a]fter I filed my charge of discrimination, I approached Mr. Brady again for a second time. He said to me: 'I don't know who is doing it.' I told him the names of six or so workers who seemed to be the wors[t] offenders . . . Mr. Brady refused to get involved."

The district court excluded the affidavit on the ground that it contradicted Stamey's deposition testimony that he did not talk to any of his supervisors about the worsening harassment after filing his EEOC charge. But the district court never mentioned Stamey's more specific deposition testimony in which he stated that he did have another conversation with Brady sometime after June 2018 but before leaving the company two months later.

The district court should have accounted for Stamey's specific testimony about this further notice to Brady. Though this specific testimony is in tension with Stamey's prior, more general testimony, it aligns with the account in his affidavit. See, e.g., *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (cautioning that "summary judgment is not a tool for deciding questions of credibility" and recognizing that "an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate

the existence of any genuine issue of material fact") (internal quotations omitted). To be sure, Stamey can be impeached with this discrepancy at trial. But for the purposes of summary judgment, we must view the evidence in the light most favorable to him and doing so requires us to credit that the conversation with Brady occurred, and that Forest River was on notice of worsening harassment after the EEOC charge.

Likewise, Stamey has presented enough evidence for a jury to find that he did not need to give Forest River more time to attempt to remedy the harassment before quitting because he reasonably believed that doing so would have been futile. After his former supervisor Pontius died, there remained three Forest River supervisors with whom Stamey had discussed the harassment. Tubicsak in HR never returned either of Stamey's messages. Stamey's supervisor Brady shrugged off at least two requests for help, claiming that Stamey could not name the offenders with certainty—despite Stamey providing him the names of some of the most persistent alleged verbal harassers. And Scott McDonald, the plant manager, chastised Stamey for reporting the harassment to Tubicsak and never made him aware of any steps being taken to stop it. After Stamey spoke to McDonald, the physical interference stopped but the verbal harassment escalated. So from Stamey's perspective there was little reason to believe that anybody at Forest River would do anything to address his persistent harassment. See *Boumehdi*, 489 F.3d at 790.

On this record, a jury could find that the company's minimal response to Stamey's complaints was unlikely to change the environment. Nobody stopped the misconduct and McDonald trivialized the daily harassment, interference, and vulgar graffiti as mere "horseplay"; did not threaten any

penalties for its recurrence; and did not monitor the situation to ensure that there was no recurrence. A jury could also find that Stamey's "last straw" reaction of quitting when a manager told him in front of coworkers that he had "one foot in the grave and the other on a banana peel" was reasonable. Because a supervisor was now contributing to the harassment, and doing so in front of Stamey's coworkers, a factfinder could conclude that management remained unlikely to intervene to stop the harassment and that any future complaints would simply "f[all] on deaf ears." *Boumehdi*, 489 F.3d at 790.

\*       \*       \*

For these reasons, we VACATE the entry of summary judgment for Forest River and REMAND for trial.

BRENNAN, *Circuit Judge*, dissenting. Forest River did not fire Sam Stamey; he resigned. Stamey seeks relief under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, arguing he was constructively discharged when Forest River permitted discriminatory harassment so intolerable it forced him to quit. As the majority opinion acknowledges, Stamey faces a "high hurdle." Not only are the requirements rigorous, but this court has never recognized a constructive discharge claim based on age. To prevail, Stamey must show that he suffered egregious, age-based harassment, and that his attempts to seek relief from the company would have been futile.

Stamey fails at both steps. Under our case law, the age-related harassment he reported, though offensive and highly regrettable, did not qualify as so intolerable that it would have forced a reasonable employee to quit. Stamey also did not do enough to aid Forest River in putting an end to his coworkers' actions, and he left before his employer could do more on his behalf. Because Stamey has failed to establish a claim for constructive discharge, I would affirm the judgment of the district court.

## I

Stamey worked for Forest River from 2007 until 2018, with a one-year layoff between 2009 and 2010. In late 2017, Stamey's coworkers began harassing him with words and with actions best described as crude practical jokes. The name-calling consisted of some age-based insults, like "grandma" and "old man," interspersed with other vulgarities and sexual innuendo. As to the practical jokes, coworkers damaged his coffee maker and, on several occasions, zip-tied his personal or work belongings together or to other fixed objects in the

workplace. When asked if a specific event triggered this sudden change in workplace environment, Stamey responded, "I don't know … I did not do nothing. I did my job." He also mentioned that Forest River "just had a bunch of young people in, and I was the oldest one there."

Nothing in the record suggests Stamey took any action to remedy the situation, either by asking his coworkers to stop or by reaching out to management, until his fiancée called Jeff Rowe, a member of Forest River's human resources department, whom she knew from her previous employment at Forest River.[1] Rowe advised Stamey's fiancée to have Stamey contact Wendy Tubicsak, Forest River's human resource manager. Stamey took this advice and left a voicemail for Tubicsak, but she never responded. Stamey did not follow up.

In late 2017, Stamey had approximately ten conversations with his supervisor, Frank Pontius, about "[e]verything that went on." Pontius spoke to the manager of the neighboring department because Stamey suspected the practical jokes emanated from that work group. That manager assured Stamey that the practical jokes would end, and for approximately two or three weeks, they did.

Stamey complained to his new supervisor, Mike Brady, in early 2018 about the practical jokes, which had resumed after the "Christmas shut down." Stamey gave Brady the names of

---

[1] On this point, Stamey's affidavit contradicts his deposition testimony. His affidavit says he talked to his supervisor, Frank Pontius first, and his fiancée called Jeff Rowe later, perhaps in early 2018. Under the sham-affidavit rule, his deposition testimony controls. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.").

the three employees who most often verbally insulted him, and Stamey speculated that they were also behind the pranks. Without knowing the identities of the pranksters, Brady said there was nothing he could do. Stamey recalled speaking to Brady two or three times in total about the verbal harassment and practical jokes.

Later in the spring of 2018, Stamey drove to Forest River's corporate office, looking for Tubicsak without an appointment. Although Tubicsak was not there, he showed photographs to her assistant, which depicted written insults throughout the workplace. The assistant provided Stamey with Tubicsak's cellphone number, and he called her. Tubicsak did not pick up, so Stamey left a voicemail. For her part, Tubicsak recalls speaking with Stamey and instructing him to talk to the plant manager, Scott McDonald. But Stamey does not remember this, and we must give him the benefit of the doubt at this procedural stage.

It is undisputed, though, that Tubicsak alerted McDonald of the issue. McDonald then called a meeting among the supervisors and the suspected wrongdoers. He warned them that the "horseplay" must stop. Exercising poor judgment, McDonald scolded Stamey for going "above his head."

After McDonald's intervention, Stamey reported that the verbal abuse ramped up, yet he did not reach out to Brady, McDonald, or Tubicsak. Instead, in June 2018, he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").[2] The next month, Forest River

---

[2] There is some confusion about whether Stamey spoke with Brady about workplace conditions after Stamey initiated the EEOC complaint. In

submitted its position statement to the EEOC, documenting its efforts to resolve Stamey's complaints.

Then, in August 2018, 62-year-old Stamey stopped going to work. Brady called Stamey, reassuring him that he still had a job at Forest River and asking him to return, but Stamey declined. In November 2018, Stamey filed a second charge of discrimination, adding allegations of conduct that occurred between June and August of that year. When he received right-to-sue letters from the EEOC, Stamey filed this lawsuit.

## II

Bullies can exist anywhere, from a classroom to a shop floor. To be sure, school leaders who fail to address pervasive student misconduct may be blamed or even ousted. In the same way, federal law punishes employers who turn a blind eye to unconstrained workplace harassment that forces a worker to resign. But responsibility for a bully's acts is not unlimited. And here, that responsibility is bounded by statute and by case law.

No one disputes that Stamey's coworkers peppered him with distasteful names and insults, wrote demeaning messages about him on walls and other surfaces, and vandalized his property. However repulsive that conduct may be, the ADEA is not a blanket prohibition on such workplace bullying. Rather, that law protects an employee forty years of age and older from age-based discrimination perpetrated by an employer. The majority opinion relies primarily on a single

_____

the end, I agree with my colleagues that the sham-affidavit rule does not apply on this point, and we cannot say whether Stamey did or did not speak to Brady after he submitted a charge of discrimination with the EEOC.

precedent, without acknowledging our court's rich constructive discharge case law. That body of law defines the requirements Stamey must meet and ultimately dictates that his claim fails.

**A**

The ADEA makes it "unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). This prohibition is "limited to individuals who are at least 40 years of age." *Id.* § 631(a). To establish a claim under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

Voluntary resignation, on its own, is not an adverse employment action because the plaintiff, not the employer, is the relevant actor. But not all resignations are voluntary. To combat *coerced* resignations, the National Labor Relations Board pioneered the constructive discharge doctrine in the 1930s, which equates "an employee's reasonable decision to resign because of unendurable working conditions" with "a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Green v. Brennan*, 578 U.S. 547, 555 (2016) (noting that, when the doctrine applies, it treats "resignation as tantamount to an actual discharge").[3]

---

[3] An ADEA plaintiff may also bring a claim against its employer for a hostile work environment, in which harassment functionally alters the

To establish a constructive discharge, the plaintiff "must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134. "[H]arassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts." *Id.* at 148. An employer can defend against a constructive discharge claim "by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of … harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." *Id.* at 134.

On many occasions, this court has declined to expand the constructive discharge doctrine beyond its outer boundary: the workplace must become "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green*, 578 U.S. at 555 (quoting *Suders*, 542 U.S. at 141). Whether that standard is met depends on the totality of the circumstances, *Gawley v. Indiana Univ.*, 276 F.3d 301, 315 (7th Cir. 2001), and is assessed "from the viewpoint of a reasonable employee." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526,

---

employee's conditions of employment. For decades, the Seventh Circuit has "assumed, but never decided, that plaintiffs may bring hostile environment claims under the ADEA." *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020) (quoting *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (citing *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001); *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 827 (7th Cir. 1999))). Stamey initially brought a claim for hostile work environment, which is easier to establish than a claim for constructive discharge, but he abandoned the hostile work environment claim before the district court.

537 (7th Cir. 1993); *see also Suders*, 542 U.S. at 141 ("The [constructive discharge] inquiry is objective.").

This standard is difficult to meet. In nearly all cases, a threat to physical safety is required. "When it becomes reasonable to fear serious physical harm, it becomes reasonable to quit immediately rather than seek redress while on the job." *Patton v. Keystone RV Co.*, 455 F.3d 812, 818 (7th Cir. 2006).

For example, on at least two occasions, we have identified egregious conduct qualifying for constructive discharge in the context of threatened racial violence. *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629 (7th Cir. 2009); *Taylor v. W.S. Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992). In *Porter*, employees taunted the plaintiff, the only black employee, with several handmade nooses and threatened him with comments, like "I wish you would die." *Porter*, 576 F.3d at 631–33. Conditions in the workplace deteriorated to the point that the plaintiff called the police to document the aggression. *Id.* And in *Taylor*, the plaintiff's boss made racist comments about him, and once recklessly pointed a handgun at the plaintiff's head. *Taylor*, 966 F.2d at 1191.

In additional instances, we have concluded that employees were constructively discharged based on conduct arising from sexual harassment. *See Patton v. Keystone RV Co.*, 455 F.3d 812 (7th Cir. 2006); *Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003); *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir. 1989). In *Patton*, we recognized the plaintiff's "fear that her supervisor was an obsessed man who—based on previous acts showing no regard for [her] right to control who could touch intimate areas of her body—was capable of, and desirous of, physically assaulting her in a serious way." *Patton*, 455

F.3d at 818. Similarly, in *Robinson*, the plaintiff's supervisor repeatedly made sexual comments to her and became violent when she spoke with other men. *Robinson*, 351 F.3d at 320–21. He threatened to kill her on at least one occasion and spoke about sexual acts he would like to perform with her. *Id.* In *Brooms*, the plaintiff endured "repeated instances of grossly offensive conduct and commentary," and an "incident in which [her supervisor] showed an extremely offensive photograph to [her], grabbed her arm when she attempted to seize a copy, and threatened to kill her." *Id.* at 423. Even the Supreme Court's landmark case on constructive discharge, *Suders*, involved violent intimidation in the context of sexual harassment—the plaintiff's aggressor would "pound on furniture to intimidate her." *Suders*, 542 U.S. at 135.

Stamey did not allege he was physically harmed or felt threatened by impending physical harm—unlike the plaintiffs in *Porter*, *Taylor*, *Patton*, *Robinson*, and *Brooms*. So, the majority opinion relies almost entirely on *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007)—a rare example of this court concluding that a constructive discharge occurred absent physical violence or threats of physical violence. But that decision is not sufficiently analogous to support the weight the majority opinion places on it.

The behavior here is more egregious than in *Boumehdi*, the majority opinion concludes, because Stamey estimated he had been insulted "one thousand" times, and the plaintiff in *Boumehdi* alleged her supervisor made "at least eighteen sex-based comments." *Boumehdi*, 489 F.3d at 786. Frequency is one metric with which to view the severity of verbal abuse, but so is the nature of those comments.

Helen Boumehdi was told repeatedly by her supervisor, Ed Vega, that women did not belong in the pressroom—where "credit cards, gift cards, calendars, and identification tags" were manufactured—and that women "think they know everything." *Id.* at 785–87. Vega also expressed his view that women should work in flower shops and wear low cut blouses and shorter shorts. *Id.* at 786. Most importantly, unlike here, the verbal abuse in *Boumehdi* was intensely personal. Vega aimed comments directly at Boumehdi:

- When Boumehdi bent over in the course of her work, Vega told her to remain in that "perfect" position. *Id.* at 786.

- Vega commented on Boumehdi's breasts when she was pregnant, speculating that she got a breast enlargement. *Id.*

- After learning that Boumehdi miscarried, Vega wondered aloud why she would get pregnant at her age. *Id.*

- Vega asked Boumehdi to clean the pressroom and told her that only women, not men, were supposed to do that job. *Id.*

- When Boumehdi complained about the abuse, Vega threatened her with undesirable work like scrubbing floors and cleaning toilets. *Id.*

All this shows that Vega harbored deep-seated resentment for women and expressed his misogyny in individualized terms to Boumehdi. By contrast, the insults directed at Stamey, although vulgar and demeaning, were more generalized and less personal.

Continuing with its analogy, the majority opinion claims the sexist, insulting conduct Boumehdi faced was all verbal, while Stamey endured harassment beyond that in the form of graffiti and vandalism. That is inaccurate. Boumehdi also alleged other forms of harassment, including that Vega wrote Boumehdi negative performance reviews, scolded her for reporting conduct to human resources, altered her schedule to reduce her pay, and refused to respond to complaints about her compensation reduction. *Id.* at 786–87.

This point does not make Stamey's case equivalent to *Boumehdi*, though, because Stamey must "link the conditions of his employment to … age-related bias." *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001). And unlike the nonverbal harassment in *Boumehdi*, the practical jokes inflicted on Stamey were not related to his age and should not be considered in the constructive discharge analysis. Stamey merely speculated that the practical jokes were committed by the same coworkers that called him names—and recall, only some of those insults were age-related. Such a tenuous association cannot support a conclusion that the practical jokes were committed with Stamey's age in mind. Accordingly, they should not be part of the summary-judgment calculus. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996) ("The working conditions must be more than merely intolerable; they must be intolerable in a discriminatory way."); *Gawley*, 276 F.3d at 315 ("[A]n employee can be constructively discharged only if the underlying working conditions were themselves unlawful or discriminatory in some fashion.").

If we consider solely Stamey's allegations that are age-based, only verbal insults remain. Those insults were diverse, and many were disconnected from any age-related animus.

On their own, those comments cannot support a claim for constructive discharge. Again, the ADEA is not a shield against general employee misconduct. It proscribes a specific type of misconduct: employer-committed age discrimination.

As shown above, any distinctions between *Boumehdi* and this case favor Forest River. The verbal harassment that Boumehdi suffered was more severe than Stamey experienced. And unlike the nonverbal harassment of Stamey, which was not related to his age, the nonverbal harassment of Boumehdi was connected to her gender. That is because the verbal and nonverbal harassment was committed by the same individual in *Boumehdi*, leaving no doubt that both forms of harassment were connected to her gender. Considering the totality of the circumstances, *Gawley*, 276 F.3d at 315, *Boumehdi* and this case are not analogs.

Because Stamey never alleged physical threats, and *Boumehdi* is dissimilar in important respects, Stamey falls short of proving he was constructively discharged. Indeed, this case resembles others in which this court decided that a constructive discharge had not occurred.[4] For example, in *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421 (7th Cir. 2004), the plaintiff's

---

[4] In two nonprecedential orders relied on by the district court, this court concluded that the plaintiff failed to establish constructive discharge under circumstances similar to those here: *Scurlock v. IRC, LP*, 716 F. App'x 544 (7th Cir. 2017) (affirming there was no constructive discharge when the plaintiff's supervisor called him "stupid," "dumb," "special," and "old," on many occasions); *Fugate v. Dolgen-corp, LLC*, 555 F. App'x 600 (7th Cir. 2014) (affirming there was no constructive discharge when supervisor made age-related offensive remarks about the plaintiff-employee like "I can't believe you forgot your teeth!" in addition to criticizing her performance and subjecting her to disciplinary action).

supervisors discussed women in a derogatory manner, tried rhyming the plaintiff's name with "slut," and screamed at her. *Id.* at 424. Employees made misogynist statements about the plaintiff, used racial epithets, and discussed who would first have sex with her. *Id.* at 424–25. Her safety was threatened too. Once, a coworker violently pushed an industrial basket toward the plaintiff. *Id.* at 425. And on two occasions, factory trays were dropped on her, which she believed was intentional. *Id.* One of those incidents resulted in an injury that required medical attention. *Id.* Despite this substantial harassment, this court held that the plaintiff's claim of constructive discharge failed because "whatever racial and sexual harassment she experienced was, for the most part, mild." *Id.* at 429.

Forest River admits its employees' conduct was "inappropriate, demeaning, and vulgar." *Cooper-Schut* also involved inappropriate, demeaning, and vulgar conduct, yet we concluded the conduct was not "so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134. That is because a constructive discharge claim requires more; specifically, conditions in the workplace must be so unbearable that any reasonable person would feel compelled to leave. On this record, Stamey has not met that threshold.

As noted above, this is the first claim under the ADEA for constructive discharge approved by our court.[5] That is not to

---

[5] On the flip side, this court has consistently rejected constructive discharge claims brought under the ADEA. *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019) (denying a constructive discharge claim under both Title VII and the ADEA because the plaintiff had "no evidence that she was subjected to a threat of violence or other conditions that are more severe than those required to establish a hostile work

say a cognizable constructive discharge claim can never be brought under that Act. But our precedents drew a line between a workplace that was coarse-but-bearable, and one that was intolerable. By recognizing Stamey's claim, which included no threat to his physical safety, and general rather than individual verbal abuse, the majority opinion moves that line.

**B**

Stamey's claim fails for a second reason. Even if "harassment so intolerable as to cause resignation" occurs, an employer must be given the opportunity to respond to and resolve malfeasance. *Suders*, 542 U.S. at 148; *Porter*, 576 F.3d at 640. Unlike most of the decisions summarized above, Stamey does not allege his *supervisors* harassed him. Rather, he argues his *coworkers* harassed him and that Forest River did not respond quickly enough. So, it is Forest River's lack of responsiveness that subjects it to liability. *Porter*, 576 F.3d at 639 ("[The plaintiff] does not contend that the harassment he endured was effectuated by his supervisors. Rather, he

---

environment."); *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (rejecting a constructive discharge claim "based entirely on [the plaintiff's] dissatisfaction with having to work at [a different] facility."); *Darnell v. Target Stores*, 16 F.3d 174, 179 (7th Cir. 1994) (holding that an ADEA plaintiff failed to establish constructive discharge because he only showed "that his job was difficult, and required him to work long hours and perform unpleasant tasks and that on top of the ordinary demands of the job, he labored under an insufferable boss"); *Henn v. Nat'l Geographic Soc.*, 819 F.2d 824, 830 (7th Cir. 1987) (denying an ADEA constructive discharge claim); *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir. 1986) (same).

maintains that management's failure to take definitive action to stop the harassment justified his departure."). Here, Forest River should not be liable for lack of responsiveness because Stamey resigned too fast. Constructive discharge means coerced departure. When Stamey resigned, that threshold had not been crossed.

An illustrative case is *Gawley*. There, the plaintiff endured "harassing comments about her pants and breasts," and had her breast groped by a supervisor. *Id*. at 315. But "[s]he did not complain to her employer about much of the harassment under the [employer's] procedures." *Id.* at 316. In fact, she "waited seven months before availing herself of the formal procedures the university established for victims of harassment even though her informal efforts to protect herself were unsuccessful." *Id.* at 315. As the plaintiff conceded, "as soon as she used the system, the university took action and the harassment stopped." *Id.* at 311. We affirmed the district court's conclusion that the plaintiff had not established constructive discharge. *Id*. at 316.

Like the plaintiff in *Gawley*, Stamey left too early. Seeking relief from Forest River was not futile, especially when his conversations with Pontius and then Tubicsak (who contacted McDonald) resulted in relief. If the harassment started up again, as Stamey claims it did, he was obligated to speak with a supervisor, as he had done before. Forest River can only solve a recurring problem if it knows the problem has again arisen. Of course, a point may arrive where it becomes futile for an employee to keep asking for two- or three-week extensions of relief—the law does not require this endless cycle—but that is not what happened here.

Stamey had other options at his disposal, but he declined to pursue them. There is no evidence he ever asked his coworkers to stop the name-calling or practical jokes. Nor did he conclusively learn the identities of his antagonizers. As to the verbal insults, Stamey only offered Brady three names. As to the practical jokes, he discussed a person at his deposition who was "bound to know" the identity of the workers who vandalized his workstation, yet apparently Stamey never asked this person about their identities nor notified Forest River that he may have pertinent information. Finally, when asked if he told his coworkers about his displeasure with their treatment of him, Stamey replied that he did not.

Stamey's coworkers knew what they were doing was wrong, just like a grade-school bully does, and nobody deserves the treatment Stamey received. Moreover, Forest River does not win an award for human resource management. Perhaps it could have done more to proactively investigate the misconduct and identify wrongdoers. But given the limited information Stamey provided, convening a meeting to scold employees was just about all Forest River could do—and McDonald took that step. When Stamey's coworkers kept up their antics after McDonald reprimanded them, Stamey made little to no effort to complain within Forest River's system. From Forest River's perspective, when it learned of misconduct, it was addressed.

In sum, the record does not permit the inference that additional attempts by Stamey to seek relief would have been futile. His constructive discharge claim fails for the separate, independent reason that, under binding case law, he acted prematurely when he gave up on Forest River's ability to remedy the situation.

### III

Simply put, there was not enough "constructive" in the plaintiff's constructive discharge claim. In reaching the opposite conclusion, the majority opinion departs from settled law. Respectfully, I would adhere to the threshold for constructive discharge set by our precedents and affirm the district court.